Nancy RYAN, Plaintiff,

v.

ELI LILLY & COMPANY, Rexall Drug Company, E. R. Squibb and Sons, Inc., The Upjohn Company, Abbott Laboratories and McNeil Laboratories, Inc., Defendants.

Civ. A. No. 77–246.

United States District Court,
D. South Carolina,
Columbia Division.

May 14, 1981.

Thomas Bleakley, Charfoos & Charfoos, Detroit, Mich., Terry E. Richardson, Jr. and Ronald L. Motley, Barnwell, S. C., for plaintiff.

H. Simmons Tate, Jr., Boyd, Knowlton, Tate & Finlay, Columbia, S. C., for Upjohn Co.

Thomas C. Mazza, New York City, William L. Pope, Columbia, S. C., for Eli Lilly & Co.

E. W. Laney, III, Turner, Padget, Graham & Laney, Columbia, S. C., for Abbott Laboratories.

Glenn Bowers, Columbia, S. C., for Rexall Drug Co.

Edward W. Mullins, Jr., Columbia, S. C., for E. R. Squibb & Sons, Inc.

Douglas McKay, Jr., Columbia, S. C., for McNeil Laboratories.

## ORDER

CHAPMAN, District Judge.

This matter is before the Court upon the defendants' joint motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The rule provides that summary judgment shall be rendered when the papers offered in support and in opposition-thereto "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). A motion for summary judgment based on sworn affidavits and deposition testimony "pierces" the allegations of the pleadings. In the face of a properly supported motion, the opposing party must either come forward with competent evidence showing the existence of a triable issue of fact, or suffer the entry of judgment against him. F.R. Civ.P. 56(e); *White v. Boyle*, 538 F.2d 1077, 1079 (4th Cir. 1976).

This is a pharmaceutical product liability action. The plaintiff, Nancy Ryan, alleges she has developed a pre-cancerous condition as a result of her prenatal exposure to diethyestilbestro (hereinafter "DES"), a synthetic estrogen taken by her mother during 1952 and 1953. This drug was promoted in the late 1940's and early 1950's for use by pregnant women to prevent loss of the fetus by spontaneous abortion. Nancy Ryan was born May 1, 1953. Prior to that time her mother had ingested DES obtained by prescription from her doctor to prevent possible miscarriage. The complaint was filed on February 8, 1977.[1] Although 118 companies were manufacturing and marketing DES in the dosage taken by plaintiff's mother in 1952 and in 1953, the complaint named only eight companies as defendants. Plaintiff alleges that the DES ingested by her mother was manufactured by Eli Lilly & Company, or by E. R. Squibb and Sons. In addition to Lilly and Squibb, the plaintiff joined Rexall Drug Company, Upjohn Company, Blue Line Chemical Company,[2] Abbott Laboratories, and McNeil Laboratories as party defendants, alleging a conspiracy in their production of synthetic estrogens. The plaintiff seeks legal as well as equitable relief, and claims numerous causes of action: negligence, breach of warranty and implied warranty, strict liability, civil conspiracy, fraud, and violation of the Federal Drug and Cosmetic Act of 1938.

The major weakness in plaintiff's case, and one issue upon which defendants' motion is based, is her inability to identify the manufacturer of the DES tablets taken by her mother nearly 28 years ago. Three and a half years of discovery have revealed nothing that would indicate which, if any, of the defendants is the culpable party.

■ It is elementary that in any action claiming injury from a product, the plaintiff must show causal connection between the defendant manufacturer and that product. The defendant manufacturer must be identified with the specific instrumentality that allegedly caused the injury, and this is the law of both North and South Carolina. *Gantt v. Columbia Coca-Cola Bottling Co.*, 193 S.C. 51, 7 S.E.2d 641 (1940); *Elledge v. Pepsi Cola Bottling Co.*, 252 N.C. 337, 113 S.E.2d 435 (1960).

> It goes without saying that if a drug manufacturer ... is to be held liable for harm caused by a product, it is necessary to show that the drug or medicine was one with which the defendant is identified in the respect asserted—that is, it must be shown that the defendant actually manufactured, compounded, or sold the drug or medicine in question. Annot., "Liability of Manufacturer or Seller for Injury Caused by Drug or Medicine Sold," 79 A.L.R.2d § 19 at 338 (1961). *See also* Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn.L.Rev. 791, 840 (1966).

Proof connecting the defendant with the instrumentality of the alleged defect is necessary regardless of the theory upon which

---

1. Plaintiff originally attempted to bring suit in class action form, but by Order of this Court on July 10, 1979, her request for class certification was denied.

2. Blue Line is no longer a party pursuant to an Order of Dismissal filed February 20, 1980.

plaintiff relies. *See, e. g., Paul v. Hardware Mutual Ins. Co.,* 254 So.2d 690 (La.Ct. App.1971); *Nigro v. Coca-Cola Bottling, Inc.,* 49 Wash.2d 625, 305 P.2d 426 (1957).

The plaintiff cannot show who manufactured the DES ingested by her mother, but contends it was one of two defendants, Lilly or Squibb. Discovery as to identification was obtained from the plaintiff, her parents, their doctor, a pharmacist, representatives of defendant drug companies, and others. These efforts have not, however, been successful in uncovering any evidence connecting any of these defendants with the drug taken by Mrs. Ryan.

William Ryan, plaintiff's father, testified that the prescription was filled at a certain Eckerd's Drug Store in Charlotte, North Carolina. The primary source of identification of the drug, and its manufacture by Lilly or Squibb, is a statement alleged to have been made by an Eckerd's Drug Store pharmacist, which statement has been denied by the pharmacist. Plaintiff's mother claims that she was told by this pharmacist that the DES bought by Eckerd's in 1952 was supplied by either Lilly or Squibb, or both. This statement is not only denied by the man who supposedly made it, but it is hearsay because it is offered to prove that Lilly or Squibb was the manufacturer. Furthermore, the pharmacist alleged to have made the statement did not even work for Eckerd's until 1956; Eckerd's has retained no prescription records from this 1952–53 period.

Plaintiff, of course, is unable to identify the particular manufacturer of the DES taken by her mother before she was born. Nor can Margaret C. Ryan, plaintiff's mother, identify the manufacturer. Mrs. Ryan remembers only that the drug came from Eckerd's; she did not know what it was when it was prescribed, she remembers none of the markings on the bottle, nor can she remember the size or the shape of the pill. She remembers only that she thinks the pill was red or white. (See Margaret Ryan's dep. at 98–100; 105, 112, 118). Nor can Mr. Ryan remember the size, shape, color or manufacturer of the DES taken by his wife. (See William Ryan dep. at 33–36; 40.). Neither the attending physician nor his records specify the manufacturer of the DES he prescribed. The drug store records were destroyed years ago, and there is no one now employed by Eckerd's Drug Company who can state which manufacturer's product would have been used to fill a prescription for DES in 1952 or 1953. (Aff. of Robert Smathers).

■ The defendants are merely seven of the one hundred eighteen companies manufacturing or distributing DES or its cogeners in 1952 and 1953. The plaintiff has offered nothing to show that one of these seven, and not one of the other one hundred eleven, manufacturers produced the drug in question. While the culpable manufacturer may be before the Court as a defendant, it is just as likely that it is not. The plaintiff is therefore unable to meet the threshold burden of maintaining this action—*i. e.,* identifying the manufacturer of the drug taken and thereby establishing causation in fact. Prosser, *Handbook on the Law of Torts,* § 41 at 236 (1971).

The applicable principle is summarized in Annot., "Products Liability: Necessity and Sufficiency of Identification of Defendant as Manufacturer or Seller of Products Alleged to Have Caused Injury", 51 A.L.R.3d 1344, 1349 (1973):

> Regardless of the theory which liability is predicated upon ... it is obvious that to hold a producer, manufacturer, or seller liable for injury caused by a particular product, there must first be proof that the defendant produced, manufactured, sold or was in some way responsible for the product, and this rule is supported in all of the cases examined in this annotation. (Footnotes omitted).

This fatal flaw in plaintiff's case is nothing new in DES litigation. A number of courts have dismissed actions in which a plaintiff was unable to connect her injuries to a particular manufacturer. In *Gray v. U. S. and Eli Lilly & Company,* 445 F.Supp. 337 (S.D.Tex.1978), a case remarkably similar to the one here, the Court summarily granted the defendant drug manufacturer's

motion for summary judgment. After extensive discovery, the plaintiff still could not identify the defendant Lilly as the particular manufacturer of the drug which caused her injury. The Court found that summary judgment was appropriate for the moving defendant because it would be "only speculation and conjecture" that might link the defendant to the injury.

In a very recent decision, a New Jersey Appellate Court affirmed a lower court's granting of summary judgment on the same grounds. *Namm v. Eli Lilly & Company*, Doc. No. A–89–78 (Super.Ct.App.Div., N.J., filed 3/16/81). The Court affirmed summary judgment finding that it was "a fundamental principle of products liability law" that a plaintiff must prove that the defendant manufacturer actually made the product which caused the injury. *Id.* at 8. *See also, Lyons v. Premo Pharmaceutical Labs, Inc.*, 170 N.J.Super. 183, 406 A.2d 185 (App.Div.1979), *cert. den.* 82 N.J. 267, 412 A.2d 774 (1979).

The rule has been aptly stated by Dean Prosser:

> [Plaintiff] still has the burden of establishing that the particular defendant has sold a product which he should not have sold, and that it has caused his injury. This means that he must prove, first of all, not only that he has been injured, but that he has been injured by the product. The mere possibility that this may have occurred is not enough, and there must be evidence from which the jury may reasonably conclude that it is more probable than not. Prosser, 50 Minn.L.Rev. at 840.

Plaintiff cannot supply any direct evidence identifying the manufacturer of the drug taken by her mother. The claim that either Lilly or Squibb is the manufacturer is unsupported and unsupportable on the record. That one of these two defendants manufactured the DES at issue here is at best a guess. *Guenther v. Armstrong Rubber Co.*, 406 F.2d 1315 (3d Cir. 1969). At the time Mrs. Ryan was prescribed DES, a number of companies marketed the product in the dosage she took. Lacking any basis for this essential element of proof, defendants Lilly and Squibb are entitled to summary judgment on all claims made solely against them.

In an attempt to circumvent the requirement that she causally connect her injuries to a particular DES manufacturer, plaintiff has placed additional reliance on claims of conspiracy among all these defendants in the licensing, manufacture, promotion and sale of DES. In her complaint, plaintiff alleges "the collective efforts of all defendants resulted in a conspiracy to defraud and deceive by virtue of their active agreement to fraudulently and deceptively misrepresent the alleged benefits of [DES] or the acquiescence to such misrepresentations . . . ." Complaint ¶ 16. In considering this claim, an examination of the events surrounding the development and marketing of DES is therefore necessary. These facts have been revealed through extensive discovery, and have not been controverted by plaintiff in her opposition to this motion.

Crucial to an understanding of this conspiracy claim is some knowledge of the history of the development and marketing of DES. Much of this history is developed in the record here, and has been set forth in detail in several reported cases. *See e. g., Ferrigno v. Eli Lilly & Company*, 175 N.J. Super. 551, 420 A.2d 1305 (Law Div. 1980); *Lyon v. Premo Pharmaceutical Labs, supra, Bichler v. Eli Lilly & Company*, App.Div. 436 N.Y.S.2d 625 (N.Y. Supreme Ct., Appt. Div., 1981.) Plaintiff alleges a long list of "collective efforts" made by these defendants in connection with DES since the early 1940s; these efforts she would have the Court call a "conspiracy." This Court, however, is convinced that the facts in the record establish neither the claimed "collective efforts" nor the elements of civil conspiracy.

A review of the facts relating to the plaintiff's conspiracy allegations is necessary to understand the second shortcoming of plaintiff's case.

Stilbestrol is the generic name for synthetic estrogen. Estrogen is a hormone produced naturally in all women in varying levels depending on the menstrual cycle,

pregnancy, menopause, and other factors. It is vital for sexual development and fertility, plays a significant role during pregnancy, and has other functions. (Hines dep. at 22–26). Stilbestrol was first synthesized in England in 1937 by a team working under the direction of Drs. E. C. Dodds and Leon Goldburg. (Hines dep. at 13, 26: Maas aff. § 5). It was considered a revolutionary breakthrough in the field of estrogen research and was one of the first synthetic substances that duplicated the physiological action of natural estrogens in the human body. (Klumpp dep. at 24–25: Maas aff. § 5: Hines aff. § 5). This compound was developed solely by the Dodds group, under a grant from the Medical Research Council of Great Britain. No defendant was involved in the development of this compound, and neither Dr. Dodds or any member of his team received technical or financial support from any defendant. The first report of the new compound was in an independent scientific journal, *Nature* 141: 247 (1938).

Stilbestrol was soon thereafter studied clinically by physicians at major medical centers. The compound stilbestrol was not patented, and it was ultimately widely manufactured both in this country and abroad. (Hines aff. § 5; Maas aff. § 5). Stilbestrol represented a scientific advance of great clinical potential; unlike natural estrogens, it was effective in oral doses, thus relieving the patient of the need for injections. It was inexpensive, costing approximately 1/300 (one three hundredth) as much as natural estrogens. It made estrogen therapy available for the first time to all women. (Hines dep. at 27–30, 353–354).

In 1940, a number of pharmaceutical companies sought approval of the Food and Drug Administration to market stilbestrol in up to 5 mg. doses to treat various conditions, none of them involving pregnancy. (Hines dep. at 27, 36, 97, 100; Klumpp dep. at 29).

In December, 1940, the FDA, acting "in the public interest" (Klumpp dep. at 32) summoned all pharmaceutical companies that had filed new drug applications (hereinafter "NDA") for stilbestrol to a meeting. The FDA wished to follow the procedure it had previously adopted with sulfathiazole. To avoid duplication of time and effort in determining whether there was sufficient clinical evidence of the safety of the product, all interested sulfathiazole manufacturers have been directed to file their individually collected clinical studies in a single "Master File." (Klumpp dep. at 23, 29–35). The FDA directed the companies with stilbestrol NDAs to withdraw their pending applications and to file, for FDA's convenience, their individual clinical studies at one time in a similar Master File. *Id.* at 33, 72, 74–75; (Hines dep. at 60–62, 64–65.) Four of the defendants named in this case were among the companies involved, three were not. Eight other companies, not defendants here, were involved with the original filings. (Hines dep. at 134–35.)

A working committee of four companies (defendants Lilly, Squibb, Upjohn, and non-defendant Winthrop Chemical Company) was formed to comply with the FDA's instructions. This "small committee" coordinated the collation of the clinical studies submitted to each of the companies by independent investigators, and submitted it to the FDA. (Hines dep. at 75–78). The FDA also wished to avoid future duplication of time and resources, and requested that each company agree to "permission clauses." These would permit other applicants to refer to the data in the Master File. (Klumpp dep. at 137, 143–44.) The FDA also required assurance that the stilbestrol used in these trials satisfied the standards of the United States Pharmacopoeia. The necessity of chemical identity of the therapeutic ingredient to allow comparison of results and to regulate purity is obvious. (Hines dep. at 218–21; Klumpp dep. at 48–49, 94–95.)

Submission of the clinical studies did not constitute an application by any company for permission to market stilbestrol. After the submission of the investigational material, each individual company still had to file its own separate NDA seeking permission to market stilbestrol for the 1941 uses.

(Klumpp dep. at 31.) For example, after the submission of the investigation material, Lilly filed its own NDA, seeking permission to market stilbestrol for certain specified purposes. (Hines aff. ¶ 9.) On September 12, 1941, the FDA approved Lilly's NDA, thus permitting Lilly to market stilbestrol for the treatment of those non-pregnancy conditions only. (Hines dep. at 96–97; Hines aff., ¶ 10.) Other companies also submitted their own NDAs, which became effective and permitted the applicants to market stilbestrol only for the purposes specified in their applications, none of which involved accidents of pregnancy. (Hines aff., ¶¶ 9–10.)

Although the typical NDA at that time involved an average of 150 to 300 patient reports, the Master File for stilbestrol included reports on more than 5,000 patients, by far the most data in the history of pharmaceutical regulation up to that time. (Hines dep. at 94.) According to Dr. Klumpp, "not only was the quantity [of the stilbestrol filing] greater than any we had had before, but the quality was also higher than anything we had had before." (Klumpp dep. at 47.)

The FDA was not a passive receptor of information. It made independent contact with clinicians and researchers, it reviewed the medical literature and it required additional clinical information to rebut those concerns which had been expressed by a small number of physicians. (Klumpp dep. at 35–45, 138–40.)

After FDA acceptance of the clinical data, the committee never met again and was dissolved. (Hines dep. at 96–97; Hines aff., ¶ 13.) After 1941, the clinical study of stilbestrol continued by independent physicians at major medical centers. There was increasing interest, notably at Harvard and at the Joslin Clinic in Boston, in its use to save babies by treating problems of pregnancy. (Hines dep. at 101–12.)

From the beginning of hormone research, independent scientists had studied and known the importance of estrogen in human pregnancy. Among the pioneers in this research were a husband and wife team on the faculty of the Harvard Medical School, Dr. George Van S. Smith and Dr. Olive Watkins Smith. They discovered that hormonal deficiencies in pregnancy led to early miscarriage and that estrogen treatment could correct these deficiencies. Initially they used the very expensive natural estrogens. Later, when stilbestrol became available, they used stilbestrol and found that it had the same physiologic effect, but was inexpensive and effective when taken orally. (Hines dep. at 104–05, 354.)

By 1947, a number of reports by independent physicians of successful use of stilbestrol to treat problem pregnancies had appeared in the medical literature, e. g., 51 Am.J.Obst. & Gynec. 411 (1946); 55 W.J. Obst. & Gynec. 597 (1947); 50 Am.J.Obst. & Gynec. 353 (1945). Based on these reports, several manufacturers filed separate NDAs with the FDA seeking permission to market stilbestrol for use as an aid in the prevention of certain problems of pregnancy. (Maas aff., ¶ 9.) For example, filings were made during 1947 and 1948 by non-defendants E. S. Miller Laboratories, Boyle & Company, Premo Pharmaceutical Company, Grant Chemical Company and Physicians' Drug & Supply Company and by defendants Lilly, Abbott, Squibb, McNeil and Rexall. These new NDAs were prepared and filed independently. There is absolutely nothing in the record to indicate that any one of these competing companies consulted, contacted or in any way informed any other company of its intention to file. Lilly had no such contact or consultation about any aspect of its 1947 filing. (Hines dep. at 237; Hines aff., ¶¶ 14–15.) In each case, as the supplemental NDAs filed in the record indicate, the medical basis for the filing was the increasing number of reports by independent researchers of their clinical investigations conducted in the decade since stilbestrol had first been synthesized. These reports demonstrated that the medication might preserve some pregnancies in danger of termination and that it caused no harm to the mother or the fetus. (Hines dep. at 115–118; Maas aff., ¶ 9.) Each defendant, who filed for this purpose made its own

determination of what constituted sufficient clinical evidence to support its application. The filings show the absence of uniformity in the statements of these companies.

Only when the FDA individually approved these later NDAs were the various companies permitted, for the first time, to indicate stilbestrol for the treatment of the specified problems of pregnancy.[3] Shortly thereafter the FDA announced that stilbestrol was "generally recognized . . . as safe," and was no longer considered a "new drug." (Maas aff. ¶ 12.) This action of the FDA allowed any company following approved manufacturing practices to market stilbestrol for any previously approved use without filing an NDA. In fact, upon this determination, the FDA would no longer accept NDA filings which related to previously approved uses. (Blue Line NDA at 6183; Williams aff. ¶ 6.) Ultimately some 300 companies marketed stilbestrol, at different times, in different forms, at different prices, with different labeling and for different indications. (Maas aff. ¶ 16.)

The defendants also differed widely in their marketing methods. Defendant Lilly never sold directly to retail pharmacies but only to independent wholesalers, and never advertised or promoted stilbestrol for use in treating problem pregnancies. (Maas aff., ¶ 17; Lilly's Answer to Plaintiff's Interrogatories Nos. 8 and 15.) In contrast, Rexall distributed the drug directly (and exclusively) to its affiliated stores, but it, too, never promoted stilbestrol's use. Whatever the marketing practices of the defendant and non-defendant manufacturers of stilbestrol, Mrs. Ryan's doctor got his information elsewhere. Dr. Jones has testified that his knowledge of stilbestrol, and his reason for using it, was his understanding of the work of the Smiths, not the activities of any pharmaceutical manufacturer. (Jones dep. at 63, 105–07, 113.)

In short, the history of stilbestrol, far from showing joint conduct, demonstrates an independent, competitive response to a widely acclaimed medical discovery, all under the regulatory supervision of the FDA. Marketed in the United States by more than 300 companies, stilbestrol was an early and classic example of a generic drug. Further, there was never any cooperation among any of the defendants in the patenting or licensing of stilbestrol. In fact, no defendant could have licensed the right to manufacture, sell or distribute stilbestrol to a single one of the more than 300 companies which are known to have manufactured or distributed this pharmaceutical. Prior to the time the FDA declared stilbestrol no longer a new drug, that right could come only upon successful application to the FDA; thereafter, no "license" was required.

These facts will now be considered in the light of plaintiff's claim that the defendants were involved in a conspiracy in the licensing, manufacture, promotion, and sale of DES.

---

**3.** A "new drug" is a term of art first defined in section 201(p) of the Federal Food, Drug, and Cosmetic Act of 1938, 52 Stat. 1040 (1938). Even though it has previously gained FDA approval for specified uses, a drug will be considered "new" and thus require a new NDA, when it is recommended for a different indication or condition, to affect another structure or function of the body, or because of the newness of the dosage, method or duration of administration. Federal Register, § 201(p) (December 28, 1938). A drug that is "new" within the meaning of section 201(p) can be marketed only after an NDA is submitted and approved for that specific indication or use. Thus, an approved NDA—such as one submitted for the 1941 uses of stilbestrol—grants a pharmaceutical company permission to market the pharma-

ceutical only for the proposed indications. Any new indications, dosage sizes, or regimen—such as those proposed in 1947 and thereafter for stilbestrol—are considered separately and independently and require a new or supplemental NDA and new FDA approval. *See,* 21 C.F.R. § 2.11(d) (19 Supp.). *See also* 21 C.F.R. § 130.9 (1956 Supp.).

Finally, in the case of stilbestrol, by 1951 and perhaps earlier, the FDA had notified pharmaceutical companies that stilbestrol was no longer a "new drug" within the meaning of the Act. (*E. g.,* Maas aff., ¶ 12; Blue Line NDA at 6183.) This meant that the drug was "generally recognized . . . as safe" by experts in the field within section 210(p) of the Act. 52 Stat. 1041 (1938) (current version at 32 U.S.C. § 321).

■ While not recognizing civil conspiracy as a separate tort, both North and South Carolina have applied the theory to hold one conspirator liable for the injury resulting from tortious conduct of another. This liability will attach only

when there is an agreement between two or more individuals to do an unlawful act or to do a lawful act in an unlawful way, resulting in injury inflicted by one or more of the conspirators pursuant to a common scheme. *Shope v. Boyer*, 268 N.C. 401, 150 S.E.2d 771 (1966); *Hospital Care Corp. v. Commercial Casualty Ins. Co.*, 194 S.C. 370, 9 S.E.2d 796 (1940).

A number of elements are required in order to state a cause of action for civil conspiracy.

The first element of any conspiracy claim is an agreement to which both the party who actually committed the wrongful act and the defendant are parties. *Daniel Boone Complex, Inc. v. Furst*, 43 N.C.App. 95, 258 S.E.2d 379 (1979), *cert. denied*, 299 N.C. 120, 261 S.E.2d 923 (1980); *Hospital Care Corp. v. Commercial Casualty Ins. Co.*, *supra*. This agreement must be shown to exist by and among each defendant and the party who actually committed the wrongful act, here, the manufacturer of the particular product taken by the plaintiff's mother. As detailed earlier, the plaintiff is unable to identify the manufacturer of the product that caused her injury.

■ The agreement must be "to do an unlawful act or to do a lawful act in an unlawful way." Civil liability for conspiracy originated in criminal law, and carried over the requirement that the action agreed upon be either a criminal act or an intentional tort. Prosser, *Handbook of the Law of Torts*, § 46, at 291–93. There is no such thing as a conspiracy to commit negligence or, more precisely, to fail to exercise due care. Plaintiff cannot recover from defendants if the agreement (if any) "was to do a lawful act ... regardless of the motives of the parties." *Evans v. Star GMC Sales and Service, Inc.*, 268 N.C. 544 at 546, 151 S.E.2d 69 at 71; *see, Ross v. Life Ins. Co. of Va.*, 273 S.C. 764, 259 S.E.2d 814 (1979). Nor can plaintiff recover if her injuries, even if attributable to a party to the alleged agreement, are the result of a lawful act. *Sams v. Brotherhood of Ry. and Steamship Clerks*, 166 F.Supp. 49, 54 (E.D.S.C.), *aff'd* 233 F.2d 263 (4th Cir. 1956); *Smith v. Ford Motor Company*, 289 N.C. 71, 81–83, 221 S.E.2d 282, 288–89 (1976); *Kirby v. Gulf Oil Corp.*, 230 S.C. 11, 24, 94 S.E.2d 21, 27 (1956).

■ The mere showing of an agreement, and of the participation by the defendant in that agreement, does not of itself impose any liability. In this regard, civil conspiracy is different from criminal conspiracy. Plaintiff must show that she has been injured by an unlawful overt act performed by one of the participants:

A civil action for conspiracy is an action for damages resulting from wrongful or unlawful acts committed by one of the conspirators pursuant to the formed conspiracy, and not simply because of the existence of the conspiracy. *McAdams v. Blue*, 3 N.C.App. 169 at 173, 164 S.E.2d 490 at 494. See *Charles v. Texas Co.*, 199 S.C. 156, 177, 18 S.E.2d 719, 727 (1942).

In addition, the injury-producing wrongful act must be "done by one or more of the conspirators pursuant to the common scheme and in furtherance of the common object." *Holt v. Holt*, 232 N.C. 497, 500, 61 S.E.2d 448, 451 (1950), *accord, Charles v. Texas Co.*, *supra*, 191 S.C. at 177, 18 S.E.2d at 727.

The plaintiff has neither alleged, nor do the facts in the record support, any of the elements of conspiracy. For the following reasons, therefore, summary judgment is granted in favor of the moving defendants dismissing all of plaintiff's claims based on "collective efforts" or "conspiracy."

The core of plaintiff's conspiracy claim is that there existed a conspiracy among the defendants fraudulently to misrepresent the benefits of stilbestrol and other "stilbene derivative" and that, even though her mother may have received stilbestrol manufactured by only one defendant, "it was the collective efforts, agreements and arrange-

ments between all defendant companies via promotional and marketing techniques that resulted in the administration of DES to the plaintiff ...." (Complaint ¶¶ 16–17.)

The testimony of Mrs. Margaret Ryan's attending physician Dr. Jones, establishes that in prescribing stilbestrol for her he totally disregarded the promotional or marketing efforts of any defendant concerning stilbestrol. He relied solely on the reports and the medical literature by leading, independent physicians and researchers:

Q. Doctor, in 1952 when you prescribed diethylstilbestrol for Margaret Ryan, were you aware of any warnings given by any of the drug manufacturers relating to—

A. No.

Q. —prescribing the drug into patients whose family has had a history of cancer?

A. No, I was not aware of it, and even if you had been, I don't know that it would have made any difference. If you believe all that drug companies put in their folders, you won't take another breath because the air is polluted ... so that wouldn't have made the difference. The researchers, as I said a moment ago, the Smiths in Boston and all of the outstanding medical school men who expressed themselves in those days were advocating it and that is what we were going by, of course. Now, the folder—their folder may have said something as I said a moment ago, I wouldn't be surprised at anything they say, but I ignore the folders all the time because I can't prescribe for a patient if I don't. (Jones dep. at 105–106).

There is nothing to counter the testimony of Dr. Jones that he was not affected by anything said or done by any defendant. Even if the marketing conspiracy postulated by plaintiff existed, the record negates any cause of action with plaintiff's claimed injuries. In no way can this allegation be used as a substitute for proof that a specific identified defendant manufactured the alleged injury-causing product.

There is no evidence that any such conspiracy ever existed. The specific allegations of concerted activity made by plaintiff can be divided into two main categories: (a) Those relating to the activities of the "small committee" in 1941 in connection with the FDA's approval of stilbestrol non-pregnancy uses; and (b) those dealing generally with the marketing of stilbestrol for treatment of accidents of pregnancy. Whether or not they show an agreement, the 1941 filings are absolutely unrelated to any subsequent use of a drug in pregnancy. Even though the drug had been approved for specified uses in 1941, it was a "new drug" when it was recommended for a different indication or condition. This was not done until the late 1940s. Hence, the NDAs for use of stilbestrol in pregnancy were not and could not have been based upon the 1941 NDAs for other uses.

The identical issue was recently addressed in *Lyons v. Premo Pharmaceutical Labs, Inc.,* 170 N.J.Super. 183, 406 A.2d 185 (App.Div.1979), *cert. denied* 82 N.J. 267, 412 A.2d 774 (1979), another stilbestrol case. There the Court affirmed summary judgment in favor of thirteen drug companies against claims of concerted action in the manufacture and sale of the drug:

Plaintiffs have tried to ignore all distinctions between the 1940 [*sic*] and the 1947 applications to market drugs with DES. It should be remembered that its use to combat abortions, which is the only issue here, resulted from the 1947 applications. It is true, as plaintiffs argue, that the companies made reference in their 1947 applications to those of 1940; however, it must be borne in mind that it is not the safety of DES which is being questioned; it is only its ingestion by pregnant women which has been declared unsafe, and the 1940 applications did not contemplate that use.

Plaintiffs have ignored these distinctions and have attempted to make it look as though Premo's 1947 application relied, as did their 1940 [application], on the testing and research of Merck. The fact

is that Premo did not in 1947 cite to the work of Merck or any other drug company as the basis of its application, or to testify to the safety of the proposed product. Instead, it relied on articles appearing in medical journals on the use and safety of DES as a drug for combatting miscarriage. And, as discussed above, these reports resulted from the enthusiasm of the medical profession itself for what doctors saw as a possible panacea for pregnancy problems.

The 1940 applications do not support the "drag race" analogy because there was nothing antisocial about placing DES on the market for its pre-1947 purposes. Plaintiffs apparently overlook the fact that products containing DES are still in use today with full approval of the FDA and the Surgeon General. It can hardly be said, therefore, that the drug companies' conduct in seeking approval for the drug in 1940 should be classified as tortious. It is 1947 with which we are concerned...." (170 N.J.Super. at 198–99, 406 A.2d at 190–91.)

■ The 1941 Master Filing does not evidence the existence of conspiracy among pharmaceutical manufacturers; the creation of the 1941 Master File was a perfectly lawful innocent act undertaken not by tortiously motivated initiative of the twelve participants, but at the direction of a federal agency charged with regulating the manufacture and marketing of drugs. Liability cannot flow from *compliance* with the legal requirement. *See Hughes Tool Co. v. Transworld Airlines, Inc.,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). "An agreement to do a lawful act cannot constitute a conspiracy regardless of the motive of the parties ...." *Evans v. Star GMC Sales and Service, Inc., supra,* 268 N.C. at 546, 151 S.E.2d at 71. *See also, Ross v. Life Ins. Co. of Va.,* 273 S.C. 764, 259 S.E.2d 814 (1979).

The balance of plaintiff's allegations relate to the decisions of various companies to market stilbestrol for treatment of accidents of pregnancy, the first of which were made almost six years after the drug had been approved for its original uses in non-

pregnant women. The uncontradicted record in this case establishes that there was no joint conduct, conspiratorial or otherwise, with respect to these decisions.

Without cooperation, coordination, consultation or any communication whatsoever with any other drug company, these companies independently sought permission to market stilbestrol for treatment of certain problem pregnancies. Relying on the extensive research that had been conducted since the original synthesis of stilbestrol in 1937, these companies (but not Upjohn) filed new or supplemental NDAs with the FDA and obtained permission to market stilbestrol for the treatment of certain problems of pregnancy involving an early termination of the pregnancy or the death of the fetus. The testimony of Dr. Hines, who was instrumental in the preparation and filing of Lilly's application, is undisputed: his company did not cooperate with any other company in any other way with respect to the preparation of this application, or engage in any joint activity whatsoever following the dissolution of the small committee in 1941. (Hines dep. at 96, 237; see also Hines aff., § 13–15).

■ Plaintiff has shown no meetings, no conferences, no telephone calls, no joint filings, no cooperation, no consolidation, no licensing—nothing that any two companies did together. Each company had its own distinct FDA filings, package literature, warnings, indications, manufacturing processes, trade names, and marketing practices. Here, as in *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132 (1980), no evidence supports plaintiff's allegations of common efforts or concerted, conspiratorial action. In fact, all of the evidence proves that no defendant entered into any agreement or even cooperated with any other drug company in the licensing, manufacturing, marketing, or promotion of stilbestrol for the use that plaintiff claims produced her injuries. On this state of the facts, summary judgment shall be entered, dismissing plaintiff's conspiracy claims.

In her response to defendants' motion for summary judgment, plaintiff has apparently abandoned the claims outlined in her complaint. Providing no new facts beyond her original unsupported allegations, she alleges four new theories which, she urges, will relieve her of the burden of proving that element of her case which she cannot prove: that her injuries resulted from the conduct of one or more of the named defendants. Plaintiff contends that the application of just one of these theories will establish that a summary judgment in defendants' favor is improper. These four theories have been described as "alternative liability," "concert of action," "enterprise liability," and "market share liability." The plaintiff now asserts that these defendants can be held liable because each, like numerous other companies, marketed stilbestrol under its generic or chemical name for use in treating accidents of pregnancy. Although plaintiff contends that she has joined only those companies that can be described, according to her "guidelines," as "culpable defendants," it is clear that what she really proposes, and all that can save her claims from dismissal, is one of two things. Either the Court must apply some theory other than conspiracy binding the defendants because of concerted activity, or the Court must engage in a wholesale shifting or outright elimination of her burden of proving that any particular defendants supplied the product that caused her alleged injuries. None of the four theories she hopes will accomplish that result represents the law that a South Carolina or North Carolina court would apply.

■ *Concert of Action.* This theory has been applied, in both North and South Carolina, but each case involves an extremely narrow fact pattern. Like civil conspiracy, the concert of action theory derives from a criminal law concept, aiding and abetting, and renders jointly and severally liable all who intentionally participate in an unlawful activity that proximately causes plaintiff's injuries. Concert has been found in such conduct as group assault and battery, illegal highway racing, conversion and trespass by related corporations, and the fraudulent utterance of false bills of lading by a railroad and a consignor. The principle behind this theory was aptly stated in *Williams v. Cape Fear Lumber Co.*, 176 N.C. 174, 96 S.E. 950 (1918):

> When two or more are engaged in an unlawful enterprise, which causes damage to another, each is individually responsible for all injuries committed in this prosecution, and this, although the specific injury was done by one of the parties alone, the liability the other being founded upon the concert of action.

The concert of action theory of liability is described in § 876 of the Restatement (Second) of Torts (1979):

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

The case in which a bystander is injured by a car involved in a drag race is a typical application of this theory. *Skipper v. Hartley*, 242 S.C. 221, 130 S.E.2d 486 (1963). All participants in the race are held jointly and severally liable to the injured party although only one vehicle actually struck the plaintiff. The rationale for the imposition of joint and several liability is that the participants in the race were not acting independently, but were jointly engaged in a common endeavor—tortious in nature—that was the proximate cause of the plaintiff's injury.

Although concert of action does not require for its application a conspiracy among the parties to engage in particular conduct, "mere common plan, design or even express agreement is not enough for liability in itself; there must be acts of a tortious character in carrying it into execution."

Restatement (Second) of Torts, § 876, Comment b (1979).

■ The California Supreme Court in *Sindell v. Abbott Laboratories, supra,* recognized the serious conceptual limitations of the concert of action approach in a drug product liability action:

> What the complaint appears to charge is defendants' parallel or imitative conduct in that they relied upon each other's testing and promotion methods. But such conduct describes a common practice in industry: a producer avails himself of the experience and methods of others making the same or similar product.
>
> Application of the concept of concert of action to this situation would take the theory far beyond its intended scope and would render virtually any manufacturer liable for the defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by the defendant.

26 Cal.3d at 605, 607 P.2d at 933, 163 Cal. Rptr. at 141. A close reading of § 876 of the Restatement suggests that the gravamen of the theory is that the parties participated in some concerted conduct that was tortious in nature. Thus, in a product liability action against drug manufacturers, a plaintiff seeking to base a complaint on a concert of action theory would have to prove in addition to a parallel course of conduct among defendants, evidence of some agreement—express or tacit—or a common plan among manufacturers not to test adequately or not to warn of dangers that were known. This plaintiff cannot do. Birnbaum, "DES Concert-of-Action Theory: New Cases Bring New Confusion" *National Law Journal* at 31 (May 4, 1981).

*Alternative Liability.* Plaintiff's reliance on "alternative liability," as defined by a handful of cases from other jurisdictions and § 433B(3) of the Restatement (Second) Torts, is likewise misplaced. Section 433B(3) defines an exception to one of the most basic tenets of tort law, proof of proximate cause:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one of them has caused it, the burden is upon each such actor to prove that he has not caused the harm.

The theory embodied in § 433B(3) clearly requires (1) that all possible suppliers of the product be before the court as parties defendant, and (2) that defendants be either (a) in a superior position to offer evidence of identification, or (b) responsible for plaintiff's inability to identify the supplier of the drug. The record negates these prerequisites.

The celebrated case of *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948) best embodies the burden-shifting doctrine of alternative liability. Plaintiff herself asserts that the *Summers* rationale evolved from the doctrine of *res ipsa loquitur.* This doctrine has been consistently rejected by the courts of this state. *King v. J. C. Penney Co.,* 238 S.C. 336, 120 S.E.2d 229 (1961); *Crider v. Infinger Transportation Co.,* 248 S.C. 10, 148 S.E.2d 732 (1966).

Whether or not a South Carolina or a North Carolina court would accept this theory of alternative liability is, nonetheless, a moot question here. Before § 433B(3) permits the burden of proof to be shifted to the defendants, plaintiff must demonstrate that the party that caused the harm is named as a defendant. Comment "g" to § 433B(3) provides:

> The rule stated in Subsection (3) applies only where it is proved that each of two or more actors has acted tortiously, and that *the harm has resulted from the conduct of some one of them.* On these issues the plaintiff has still the burden of proof. (emphasis added).

Comment "h" to § 433B(3) indicates further that "[t]he cases thus far decided in which the rule stated in Subsection (3) has been applied all have been cases in which *all of the actors involved have been joined as defendants."* (emphasis added). While Comment "h" notes that modification of the rule is conceivable where "one of the actors is not or cannot be joined," the comment

does not go so far as to suggest the wholesale abandonment of the requirement that all or substantially all of the allegedly tortious defendants be present before the Court. Specifically, plaintiff must produce evidence that one of the defendants' products was taken by her mother and caused her injuries; a suit against seven of one hundred eighteen manufacturers must fail on this theory.

In *Sindell v. Abbott Laboratories, supra*, the California Supreme Court refused to allow plaintiff to rely on alternative liability to shift to defendants the burden of exculpation where only five of two hundred possible suppliers of the drug were before the court. After measuring "the chance that any one of the defendants supplied the injury-causing drug by the number of possible tortfeasors," the *Sindell* court concluded that "the possibility that any of the five defendants [before the court] supplied the DES to plaintiff's mother is so remote that it would be unfair to require each defendant to exonerate itself." 26 Cal.3d at 603, 607 P.2d at 931, 163 Cal.Rptr. at 139. This Court is in agreement with that rationale.

*Enterprise Liability.* The Court in *Sindell* also rejected the applicability of the "enterprise liability" theory. This theory arose in *Hall v. E. I. DuPont deNemours & Co.*, 345 F.Supp. 353 (E.D.N.Y.1972). *Hall* and another case arose from eighteen incidents across the United States in which children were injured by blasting caps. In both cases liability was premised on the defendants' failure to place warnings on individual caps and to render their products less easily detonated by children. Both complaints allege that the defendant and other manufacturers were aware of the dangers their products posed for children but that virtually the entire blasting cap industry and its trade association had cooperated in maintaining the inadequate safety standards that led to plaintiffs' injuries.

In *Hall*, plaintiffs were able to identify the manufacturer of the injury-causing caps. Relying on the unique allegations of the complaint and a postulated "national body of state tort law" that embraces strict product liability, Judge Weinstein denied defendants' motion to dismiss. In his view, the allegations of the complaint, if proved, could justify the imposition of joint or vicarious liability either on a theory of actual concert of action, or because the members of the blasting cap industry were engaged in a joint "enterprise." The opinion appears to derive from such diverse concepts as *respondeat superior*, nondelegable duty, and ultra hazardous activity, all of which allow the imposition of liability without fault in situations where despite the taking of reasonable precautions, injury is inevitable and predictable. *See* 345 F.Supp. at 376–78.

The expansive notion of vicarious liability represented by the enterprise concept—which would render every manufacturer an insurer not only of the safety of its own products, but of all generically similar products made by others—is repugnant to the most basic tenets of tort law. As the Court recognized in *Namm v. Charles E. Frosst & Company, Inc., supra*, another DES case:

> Adoption of this legal theory would, of necessity, result in total abandonment of the well settled principle that manufacturers are only responsible for damages caused by a defective product upon proof that the product was defective and that the defect arose while the product was in the control of defendant .... [T]raditional methods of assessing and apportioning damages among defendants would also, of necessity, have to be abandoned and new ones fashioned. Slip Op. at 18 (citations omitted).

The California Supreme Court in *Sindell, supra*, also found the application of *Hall* to DES cases inappropriate both on the facts and as a matter of law:

> We decline to apply this theory in the present case. At least 200 manufacturers produced DES; *Hall*, which involved 6 manufacturers representing the entire blasting cap industry in the United States, cautioned against application of the doctrine espoused therein to a large number of producers. Moreover, in *Hall*, the conclusion that the defendants jointly

controlled the risk was based upon allegations that they had delegated some functions relating to safety to a trade association. There are no such allegations here, and we have concluded above that plaintiff has failed to allege liability on a concert of action theory.

Equally important, the drug industry is closely regulated by the Food and Drug Administration, which actively controls the testing and manufacture of drugs and the method by which they are marketed, including the contents of warning labels. To a considerable degree, therefore, the standards followed by drug manufacturers are suggested or compelled by the government. Adherence to those standards cannot, of course, absolve a manufacturer of liability to which it would otherwise be subject. But since the government plays such a pervasive role in formulating the criteria for the testing and marketing of drugs, it would be unfair to impose upon a manufacturer liability for injuries resulting from the use of a drug which it did not supply simply because it followed the standards of the industry. [26 Cal.3d at 610–11, 607 P.2d at 935, 163 Cal.Rptr. at 143 (citations and footnotes omitted).]

*Market-Share Liability.* While the Court in *Sindell v. Abbott Laboratories, supra,* correctly rejected the applicability of "alternative liability," "concert of action," and "enterprise liability," a bare majority went on to fashion a remarkable new burden-shifting theory which is not now the law of either North Carolina or South Carolina.

The Court, admitting that the rule it was about to adopt was a total departure from all previous rules of causation and liability, held that the plaintiff had stated a cause of action if she had joined "in the action the manufacturers of a substantial share of the DES which her mother might have taken." 26 Cal.3d at 612, 607 P.2d at 937, 163 Cal. Rptr. at 145. The majority offered, as explanation for this unprecedented legislation, its "rough justice" notion that under its new rule "[e]ach defendant will be held liable for the proportion of the judgment represented by its share of that market unless it demonstrates it could not have made the products which caused plaintiff's injuries." *Id.*

■ The market-share theory does not apply to this case. Plaintiff has neither alleged nor offered any evidence to show that the defendants before the Court accounted for a "substantial share" of the relevant stilbestrol market. Thus, even if the theory of market-share liability could be reconciled with the plainly contrary law of the only state interested in this controversy, plaintiff has offered no basis for its application.

The California court's market-share theory of liability represents a rejection of "over one hundred years of tort law which required that before tort liability was imposed a 'matching' of defendants' conduct and plaintiff's injury was absolutely essential." 26 Cal.3d at 616, 607 P.2d at 939, 163 Cal.Rptr. at 147 (dissenting opinion). The courts of both Carolinas, however, still adhere to this fundamental principle.

■ The unequivocal law of South Carolina is the plaintiff in a negligence action has not only the burden of proving negligence but also the burden of proving that the injury or damage was caused by the actionable conduct of the particular defendant. Thus in *Messier v. Adickes,* 251 S.C. 268, 161 S.E.2d 845 (1968), a judgment for plaintiff was reversed because

where the cause of plaintiff's injury may be as reasonably attributed to an act for which defendant is not liable as to one for which he is liable, plaintiff has failed to carry the burden of establishing that his injuries were the proximate result of defendant's negligence.

*See also, Elledge v. Pepsi Cola Bottling Company,* 252 N.C. 337, 113 S.E.2d 435 (1960). The Supreme Court of South Carolina has not carved out any exceptions to this traditional rule. The Court places the burden of proof of proximate cause squarely on the plaintiff. Application of this burden-shifting theory would violate established public policy and fundamental princi-

ples of tort law and procedure in this state in a variety of ways. This Court declines to apply this theory in the present case.

 Finally, plaintiff asserts that summary judgment must be denied based on her contention that the brief filed in opposition to defendants' motion constitutes a pleading, and that the facts stated therein must be accepted as true. The Court's response to this unusual claim is twofold. First, Rule 7(a) of the Federal Rules of Civil Procedure provides that there shall be six forms of pleading. "No other pleading shall be allowed, except that the Court may order a reply to an answer or a third-party answer." This Court is therefore prohibited from viewing plaintiff's brief as a pleading.

The second flaw in plaintiff's claim requires a look at the provisions of Rule 56(c). That section of the rule on summary judgments provides that a judgment "shall be rendered forthwith if the *pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,* if any, show that there is no genuine issue as to any material fact ...." No where does the rule mention that the briefs or memoranda of parties shall be considered to show that there are facts in dispute.

It is also well settled that plaintiff cannot successfully defeat a motion for summary judgment on claims that are supported solely by the allegations in his pleadings. Subparagraph (e) of Rule 56 expressly provides that:

> An adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts that there is a genuine issue for trial.

Indeed, plaintiff's counsel's assertion that his "Statement of Facts offers a forecast of what the evidence will show at trial", is clearly inadequate, inasmuch as he has not provided, set forth, or even cited a single item of admissible evidence. As Judge, later Justice, Cardozo stated:

> [t]he very object of a motion for summary judgment is to separate what is formal or pretended in denial or averment from what is genuine and substantial, so that only the latter may subject a suitor to the burden of a trial.

*Richard v. Credit Suisse,* 242 N.Y. 346, 350, 152 N.E. 110, 111 (1926).

This Court, therefore, finds, pursuant to Rule 56, that defendants' motion for summary judgment is properly granted on all causes of action.

AND IT IS SO ORDERED.