**William H. SOWLES, Appellant,**

v.

**URSCHEL LABORATORIES, INC., Appellee.**

No. 78–1732.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1979.

Decided April 17, 1979.

David A. Stofferahn (on brief), of Grose, Von Holtum, Von Holtum, Sieben & Schmidt, Minneapolis, Minn., argued, for appellant; Paul L. Pond, Worthington, Minn., on brief.

John M. Kennedy, Jr. (on brief), of Jardine, Logan & O'Brien, St. Paul, Minn., argued, for appellee.

Before HEANEY and McMILLIAN, Circuit Judges, and SCHATZ,* District Judge.

SCHATZ, District Judge.

This products liability case arose when the plaintiff-appellant, William Sowles, injured his hand trying to unclog the blades of a poultry dicing machine while working for Campbell Soup Company in Worthington, Minnesota. Sowles brought suit

* Albert G. Schatz, United States District Judge for the District of Nebraska, sitting by designation.

against Urschel Laboratories, Inc. (hereinafter Urschel), an Indiana corporation which manufactured the machine in question. Sowles alleged that the machine itself was defective and, further, that Urschel was negligent in failing to provide adequate instructions concerning a safe method to unclog the dicer blades. Jurisdiction was founded on diversity of citizenship and the matter is for resolution under Minnesota law. By answers to special interrogatories, the jury found that the machine was not defective, but that Urschel was guilty of negligence and rendered a verdict in favor of the plaintiff. The district court granted Urschel's post-trial motion for judgment notwithstanding the verdict and Sowles appeals. The question presented to this court is whether the evidence is insufficient as a matter of law to sustain the jury's verdict of liability on the part of Urschel. We affirm.

## I

The facts are these. Sowles began working for Campbell Soup Company (hereafter Campbell) in 1952. From 1962 until his accident on May 1, 1972, Sowles worked full time in the dicing department of the company plant. His primary duties involved counting and weighing boxes of poultry meat which had been prepared for use in Campbell's canned products. On occasion Sowles would also substitute for other employees and perform their duties. Sowles estimated at trial that approximately ten per cent of his time was spent as a dicing machine operator.

The dicing operation at Campbell consists of a mechanized system of conveyor belts which carry poultry meat through its various stages of preparation. Deboned meat is first taken to a "shaker room" where it is chilled to a temperature considered appropriate for dicing. The chilled meat is then directed on a conveyor belt toward two side-by-side dicing machines where it is dropped into stainless steel hoppers. The machine operator places the meat into the feeder chute of the machine which leads to the blades, where the meat is diced into one-inch cubes. The cubed meat then travels by conveyor belt to the boxing area preparatory to freezing.

Not infrequently the blades of the dicing machines become clogged with meat, either because some of the meat is frozen or because meat is fed into the machine faster than the blades can dice it. When this happens it is the job of the machine operator to remove the excess meat, which task is usually performed by placing one's arm into the feeder chute and manually dislodging the meat from the blades.

For many years Campbell has had in effect a work rule requiring its machine operators to follow a three-step procedure before attempting to remove meat from the dicer blades. This procedure requires shutting off the power to the conveyor system feeding into the machine, shutting off the power to the dicing machine itself by pressing the off switch and, finally, shutting off all power to the machine by disconnecting the electrical plug from its nearby wall socket.

Each dicing machine has its own electrical plug, both of which are inserted into separate outlets of a single over-and-under wall socket. Each machine also has its own set of on-off switches consisting of two vertically arranged buttons, the on button being located on top. Both sets of switches are mounted on a post located several feet from the dicing machines and, like the machines, the two sets of switches are attached side by side. However, depending upon which outlet the machines are plugged into, either of the given machines might be operated by either set of switches. Often, the machines are removed from their positions on the conveyor line for the purpose of cleaning or repair. Since the machines are identical, they might be returned to the conveyor line in an order opposite from their original positions. Neither the switches nor the machines are marked in such a way as to indicate which set of switches operate which machine.

On direct examination, Sowles testified as follows concerning his understanding of the on-off switches and their relationship to the dicing machines:

Q. So if the cords to the machine were reversed in the wall sockets, that would reverse the switches on the post?

A. (Sowles) That would reverse the switches on the post.

Q. So what is labeled as "one dicer right" on that picture would not operate the one dicer right, necessarily?

A. I would say that it wouldn't.

Q. This would be because the dicers could be interchanged?

A. The dicers would be interchanged.

Q. Was this the situation during the whole time you worked in the dicing room, Mr. Sowles?

A. From 1965, at least, on.

Q. You were aware of the situation?

A. I was aware of the situation.

On May 1, 1972, the day of his accident, Sowles was working as a machine operator when the blades of both dicers became clogged with meat at about the same time. Sowles pressed one of the off buttons, but did not disconnect the wall plugs. He then successfully unclogged the machine located to his right and reactivated the same by pressing the on button. Thinking that he had earlier shut off the power to both machines, Sowles then placed his arm into the feeder chute of the left machine. The left machine was still on, however, and the roll bars drew Sowles' hand down into the dicer blades, severely lacerating his three center fingers. Sowles was unable to remove his hand from the machine until a co-worker disconnected the wall plug.

This incident represented the second time Sowles had attempted to unclog a dicing machine while it was still running. In October of 1968, he had also reached his arm into the feeder chute under a mistaken belief that he had shut off the machine. On that occasion, however, Sowles was wearing a freezer glove and, while the glove was torn from his hand, Sowles escaped uninjured. Following that incident, Sowles was given a written reprimand by his employer for not following company safety regulations.

Sowles contended at trial that Urschel, as the manufacturer of the dicing machine, had negligently caused Sowles' injury because its operator's manual failed to provide proper instructions on how to safely unclog the dicer blades. In answer to a special interrogatory, the jury apportioned responsibility for Sowles' injury as follows: Campbell 45%, Urschel 29%, Sowles 26%. The jury also determined that Sowles had sustained damages in the amount of $24,500. Following a hearing on Urschel's motion for judgment n. o. v. or in the alternative for a new trial, the district court concluded that the evidence of record was insufficient as a matter of law to support a verdict of liability, and accordingly, granted Urschel's motion for judgment notwithstanding the verdict and dismissed plaintiff's complaint.

II

In testing the sufficiency of evidence to sustain a jury verdict in diversity actions, this court has applied the appropriate state sufficiency standard where, as here, the issue has not been raised by the parties and the state and federal standards are similar. *McIntyre v. Everest & Jennings, Inc.*, 575 F.2d 155, 158 (8th Cir. 1978); *Gisriel v. Uniroyal, Inc.*, 517 F.2d 699, 701 n. 6 (8th Cir. 1975); *Hanson v. Ford Motor Co.*, 278 F.2d 586, 589–90 (8th Cir. 1960) (applying Minnesota law). Therefore, we look for guidance to the Minnesota courts, which instruct us that

[A] motion for a judgment notwithstanding, whether based on negligence or on contributory negligence, should be denied unless the evidence in support of the verdict, and all reasonable inferences to be drawn therefrom, be so wholly incredible and unworthy of belief or so conclusively overcome by other uncontradicted evidence that the want of negligence or the presence of contributory negligence is so clear as to leave no room for an honest difference of opinion among reasonable men.

*Johnson v. Evanski*, 221 Minn. 323, 22 N.W.2d 213, 215 (1946); *see also Stapleman v. St. Joseph the Worker*, 295 Minn. 406, 205

N.W.2d 677, 679 (1973); *McCormack v. Hankscraft Co.*, 278 Minn. 322, 154 N.W.2d 488, 492 (1967). Applying this standard to the record before us, we conclude that the Minnesota courts would hold as a matter of law that Urschel is not liable for Sowles' injury.

In support of the verdict, Sowles advances two arguments. First, it is asserted that certain instructions actually contained in Urschel's operating manual are misleading. Second, Sowles claims that the manual fails to include a required instruction explaining a safe method to unclog the dicing machines. Sowles asserts these propositions as independent bases for a finding of liability. Upon consideration neither argument is persuasive.

Attention is initially focused on the following passage from the operating manual:

Method of Feeding Machine

The product to be diced or strip cut is dumped into the hopper and pushed by hand into the feed opening in the bottom of the hopper. This opening is 4″ x 5″ in size, and is restricted by a safety bar which, in effect, provides two feeding slots 5″ in length by 1¾″ in width. The large overall opening allows full visability into the dicing unit, but discourages the machine operator from placing his hand or arm into the opening.

Sowles contends that this language, and particularly the first sentence thereof, is misleading in that it encourages the operator to place his hand near the dicer blades while the machine is running. This, it is urged, might tend to lull an unwary workman into a belief that such conduct is expected and not dangerous. For its part, Urschel has joined the debate by pointing to the last sentence of the quoted passage which, it contends, erases any doubt that the human hand was intended to come in contact with the moving blade.

On review, this court declines to decide whether the instruction is accurate and proper or whether reasonable minds might find it to be misleading. Instead, we are satisfied that the issue should never have been presented to the jury. On the record before us, there can be no doubt but that Sowles never read or even saw Urschel's manual. Therefore, nothing contained therein could have had any direct effect on Sowles' own conduct. Moreover, the assumed danger had not materialized, *i. e.*, Sowles was not an unwary workman. He had once before met with near-tragic results attempting to remove meat from a running dicer. Out of a felt necessity to stop the blades before inserting his hand on the occasion in question, Sowles attempted to and thought he had shut off the machine. These plain and uncontroverted facts preclude the conclusion that the above-quoted passage caused Sowles' injury.

Sowles next contends that Urschel had a duty to warn the operators of its machines that the dicer blades might become clogged, and to prescribe a safe method for unclogging them. This argument proceeds to the conclusion that Urschel's failure to give such warnings led to Sowles' accident because Sowles was not informed of the hazard, either directly or through his employer, Campbell, who it is claimed, might have been more diligent in its efforts to instruct its employees had Urschel given the appropriate warning. Again, the record does not justify this line of reasoning.

We begin with the proposition that, under Minnesota law, Urschel was under no duty to warn of an apprehended or obvious peril. *Stapleman v. St. Joseph the Worker*, 295 Minn. 406, 205 N.W.2d 677 (1973); *Munoz v. Applebaum's Food Market, Inc.*, 293 Minn. 433, 196 N.W.2d 921 (1972). This court observed recently in a similar context that " 'no one needs notice of what he knows or reasonably may be expected to know.' " *McIntyre v. Everest & Jennings, Inc., supra*, 575 F.2d at 159 (applying Missouri law). This proposition, by itself, is unremarkable and not directly challenged by the appellant. Rather, the argument is made that the evidence is conflicting on the issue of how much Sowles actually knew, and that the jury was entitled to resolve those conflicts in favor of

Sowles.[1] In advancing this argument, much is made of Sowles' own testimony that he was never actually made aware of step three of Campbell's work rule, which requires the dicing machines to be unplugged before attempting to remove meat from the blades. In addition, Sowles testified that he had never seen anyone do so as part of their efforts to unclog the machines. Assuming that the jury might find that this testimony is not wholly incredible, nevertheless, we conclude that Sowles was aware of the danger and, therefore, that Urschel breached no duty of care owed to him.

While Sowles might not have been specifically aware of Campbell's requirement that the machine be unplugged, he was clearly aware of the requirement that the machine be shut off before commencing with the unclogging operation. On cross-examination, Sowles testified as follows:

Q. You knew that the procedure to unclog the machine was to turn off the machine?

A. (Sowles) That is right.

Q. To shut the machine down?

A. That is right.

Q. It was a procedure that you were familiar with going all the way back to 1962, isn't that correct?

A. That is right.

\* \* \* \* \* \*

Q. It was Campbell's safety policy in May, 1972, that if the machine was clogged before you were to unclog it you were to shut the machine off?

A. That is right.

Q. And this, would it be fair to say, was in fact general knowledge of anybody that would attend a dicing machine?

A. Yes.

Q. And you knew this before you got hurt?

A. Yes.

In addition to this, Sowles made it plain in his direct testimony, quoted in part I of this opinion, *supra*, that he understood the relationship between the machines and the electrical switching system.

Summarizing then, it is uncontroverted that Sowles knew that placing one's hand in a running dicer was dangerous. He knew that the machines could be shut off by means of an on-off switch and that his employer required him to do so. He knew that both machines could be turned off at the same time and that the electrical system made the pressing of a single switch a 50–50 proposition in regard to a given machine. He knew the reason for this was that both the machines and their electrical plugs were unmarked and interchangeable. He had learned all these facts from experience.

Under these circumstances, we hold that Sowles was aware that a dangerous situation existed and that Urschel, therefore, breached no duty in failing to warn him about it.[2] Accordingly, the judgment of the district court is affirmed.

---

1. In presenting its alternative post-trial motion for a new trial, Urschel argued that the danger posed by the dicing machines was obvious. Therefore, Urschel claims, it had no duty under Minnesota law to give a warning, even if Sowles was unaware of the danger. This proposition is sound. In *Munoz v. Applebaum's Food Market, Inc., supra*, the Minnesota Supreme Court, commenting on the scope of the duty to warn, stated: "The test is not whether the injured party actually saw the danger, but whether it was in fact visible." *Id.*, 196 N.W.2d at 922. The district court, however, concluded that the risks posed by the dicing machines were complicated by the electrical switching system and, therefore, that a jury might find the danger to be obscure and not obvious. On appeal, we need not resolve this issue, for we find that the record unequivocally establishes Sowles' awareness of the dangerous situation. When the plaintiff himself is actually aware of the danger it does not, of course, avail him to point out that it might not be obvious to someone else.

2. Even if we were to assume that Urschel owed Sowles a duty to warn, we would, on the basis of the record before us, be constrained to hold that Sowles proceeded unreasonably to encounter the risk under circumstances rendering his own negligence equal to or greater than that of Urschel as a matter of law.