Ronnie K. BAUGHMAN, Plaintiff,

v.

GENERAL MOTORS CORPORATION, Defendant.

Civ. A. No. 3:84–1520–15.

United States District Court,
D. South Carolina,
Columbia Division.

May 7, 1985.

George A. Kastanes, Frederick A. Gertz, Columbia, S.C., for plaintiff.

Stephen G. Morrison, Richard H. Willis, Stanford E. Lacy, Columbia, S.C., for defendant.

## ORDER

HAMILTON, District Judge.

The present case is a products liability action arising out of the explosive separation of a multi-piece wheel rim assembly. Jurisdiction is founded upon 28 U.S.C. § 1332. The matter is presently before the court upon motion of the defendant, General Motors Corporation (hereinafter "G.M."), for summary judgment. Rule 56, Federal Rules of Civil Procedure.

At the time the facts relevant to the present cause of action occurred, the plaintiff was employed as a tire mechanic at Newton Truck Rentals, Inc. (hereinafter "Newton"). On May 25, 1981, plaintiff was engaged in changing a worn tire off of a 1979 G.M.C. truck,[1] vehicle identification number T17DD9V586462. Plaintiff removed the left outside wheel from the truck, disassembled the tire, rim and side ring, and then inflated the wheel assembly[2] in a safety cage located in Newton's shop. Once the tire was inflated, the plaintiff rolled the wheel assembly out of the cage and as he began to place it back on the truck, an explosive separation occurred, causing plaintiff's injuries.

The plaintiff has identified the type of rim which exploded as a CR-2 rim assembly. The CR-2 rim assembly is a multi-piece rim consisting of a rim base and single side ring. The side ring has a split in its circumference, giving the ring sufficient flex to be buttoned into the groove on the rim base. The split side ring has an approximate one-half inch "toe" that fits under the bead of the tire, and a properly assembled and aligned side ring is held in place on the rim base by the air pressure in the tire. The CR type rim assemblies were neither designed nor manufactured by G.M. CR type rim assemblies were designed in 1964 by the Firestone Tire and Rubber Company, and have been manufactured by both Firestone and the Goodyear Tire and Rubber Company under a license from Firestone.

Although G.M. does not manufacture CR type multi-piece rims, it does incorporate this type of rim assembly into many of the trucks it manufactures. G.M. normally utilizes a CR-3 rim assembly on its trucks. A CR-3 rim assembly is similar in configuration to the CR-2, and utilizes the same rim base. The CR-3 rim assembly, however, utilizes a side ring assembly consisting of two pieces, a split lock ring and continuous side ring. The only use by G.M. of the CR-2 rim assembly occurred during a materials shortage in 1974. Because Firestone was unable to supply a sufficient number of CR-3 rim assemblies in time to meet G.M.'s production schedule that year, G.M. purchased a limited number of CR-2 assemblies from Firestone and incorporated them into three hundred (300) to three hundred and thirty-five (335) 1975 model year G.M.C. and Chevrolet trucks. The plaintiff does not dispute that this was the only use by G.M. of the CR-2 rim assembly.

Although plaintiff can identify the type of rim assembly (CR-2) which exploded and caused his injuries, he cannot identify the actual accident rim which exploded. While various witnesses to the accident have speculated as to what happened to the accident rim assembly, none can identify the present location of the rim assembly and it

---

1. The truck in question in this litigation was purchased new by Newton Truck Sales, Inc. Newton Truck Sales, Inc., and plaintiff's employer, Newton Truck Rentals, Inc., are affiliated corporations and the court will refer to both as "Newton" in this order.

2. The rim in question was a multipiece rim. When the court refers to a "wheel assembly," it means the rim base, side ring and tire. When the court refers to a "rim assembly," it is denoting the rim base and side ring.

is thus unavailable for inspection. Furthermore, plaintiff cannot establish that G.M. placed the actual accident rim assembly into the stream of commerce. It was Newton's regular business practice to remove the rear tires from its newly purchased trucks and substitute retreads in their place. This substitution normally involved changing the entire wheel assembly since Newton kept completed and inflated wheel assemblies on hand for use in its operations. The rim which exploded was clearly not original equipment on the 1979 model year truck that plaintiff was working on, since G.M. used a limited number of CR–2 rims only on its 1975 model year trucks. Furthermore, G.M. specifically recommended against the use of "used" wheel rims. Although there is no evidence to suggest that the accident rim was used equipment, this would tend to show that the accident rim was not placed in the stream of commerce by G.M. G.M. only sold CR–2 rims in 1974 to 1975, so use of a CR–2 rim sold by G.M. would necessarily have been use of a used product. Accordingly, plaintiff cannot establish that the accident rim was placed into the stream of commerce by G.M.

The defendant's motion for summary judgment is based upon the plaintiff's inability to show that it sold the accident-causing rim or placed such rim into the stream of commerce. G.M. asserts that a prerequisite to liability under any potential theory of recovery is that the defendant must have placed the allegedly defective component into the stream of commerce, either as original equipment or as a recommended replacement part. G.M. contends that since it had no hand in the eventual placement of the accident rim assembly into the stream of commerce, plaintiff's action must fail as a matter of law.

■ Since it is undisputed that G.M. did not design nor manufacture the CR–2 rim, plaintiff's theory of liability against G.M. must of necessity be predicated upon the theory of assembler's liability. Under this doctrine, a manufacturer/assembler who incorporates a defective component part into his finished product and places the finished product into the stream of commerce is liable in tort to one injured as a result of a defect in the component part. The rule imposing liability upon an assembler applies notwithstanding the fact that the manufacturer/assembler did not manufacture the component part. *See Ford Motor Co. v. Mathis*, 322 F.2d 267 (5th Cir. 1963); *Vandermark v. Ford Motor Co.*, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964); *Comstock v. General Motors*, 358 Mich. 163, 99 N.W.2d 627 (1959); *Goldberg v. Kollsman Instrument Corp.*, 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81 (1963); *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916); *Abee v. Stone Mountain Memorial Association*, 169 Ga.App. 167, 312 S.E.2d 142 (1983); *Nelson v. Coleman Co.*, 249 S.C. 652, 155 S.E.2d 917 (1967). *See generally*, 63 Am. Jur.2d *Products Liability* § 180 *et seq.* (1984); 2 L. Frumer & M. Friedman, Products Liability § 16A[4][b][i] (1984); W. Kimble & R. Lesher, Products Liability § 34 (1979); Annot: 3 A.L.R.3d 1016 (1965).

■ The rationale for holding the assembler responsible for the failure of a component which it did not design has been stated in terms of both strict liability and negligence. Under a negligence analysis, courts at first were willing to impose liability on the manufacturer/assembler of a finished product due to the manufacturer's/assembler's duty to test or inspect those components for defects. *See Nelson v. Coleman Co.*, 249 S.C. 652, 155 S.E.2d 917 (1967); 63 Am.Jur.2d *Products Liability* § 182 (1984); Annot: 3 A.L.R.3d 1016, at § 3 (1965). Through further refinement in the courts, the law has evolved to the rule that the assembler of a finished product is responsible for the failure of a component part if the assembler has held out the finished product as its own, and for purposes of liability in negligence, the assembler will be considered as the manufacturer of the component parts included in the finished product. *See, e.g., Ford Motor Co. v. Mathis*, 322 F.2d 267 (5th Cir.1963); *Boeing Airplane Co. v. Brown*, 291 F.2d 310 (9th

Cir.1961); *Favors v. Firestone Tire & Rubber Co.,* 309 So.2d 69 (Fla.Dist.Ct.App. 1975); *Markel v. Spencer,* 5 App.Div.2d 400, 171 N.Y.S.2d 770 (1958).

Under the doctrine of strict liability in tort, courts have not focused upon the issue of whether an assembler manufactured a defective component part, but the focus has been upon whether or not the assembler has sold the defective component part and thus placed it in the stream of commerce. S.C.Code Ann. § 15–73–10 (Law. Co-op.1976) imposes liability upon one who sells a product in a defective condition unreasonably dangerous to the consumer or his property. The justification for this imposition of liability is that the public has a right to expect that a reputable seller will stand behind its goods, and the burden of accidental injuries is properly placed upon those who market the defective component. Restatement (Second) of Torts § 402(A) comments c, e (1965). The imposition of liability upon assemblers has also been justified on the ground that the assembler's position in the marketing chain allows it to exert pressure on the manufacturer of the component part to enhance the safety of its product. *See Hammond v. North American Investments,* 97 Ill.2d 195, 73 Ill.Dec. 350, 454 N.E.2d 210 (1983).

▮▮▮ Any theory of assembler liability, however, requires that the assembler actually sell or otherwise place the defective product on the market. It is a fundamental principle of the law of products liability that a product manufacturer is not an insurer of its product, and a plaintiff may recover against a manufacturer only upon a showing that the product was in a defective condition unreasonably dangerous at the time it left the manufacturer's control. As a necessary corollary, the plaintiff must be capable of showing that the defendant either manufactured, sold or exercised control over the defective product.

It is elementary that in any action claiming injury from a product, the plaintiff must show causal connection between the defendant manufacturer and that product. The defendant manufacturer must be identified with the specific instrumentality that allegedly caused the injury, and this is the law of both North and South Carolina. *Gantt v. Columbia Coca-Cola Bottling Co.,* 193 S.C. 51, 7 S.E.2d 641 (1940); *Elledge v. Pepsi Cola Bottling Co.,* 252 N.C. 337, 113 S.E.2d 435 (1960).... Proof connecting the defendant with the instrumentality of the alleged defect is necessary regardless of the theory upon which plaintiff relies. *See, e.g., Paul v. Hardware Mutual Ins. Co.,* 254 So.2d 690 (La.Ct.App.1971); *Nigro v. Coca-Cola Bottling, Inc.,* 49 Wash.2d 625, 305 P.2d 426 (1957).

*Ryan v. Eli Lilly & Co.,* 514 F.Supp. 1004, 1006–07 (D.S.C.1981). The plaintiff herein is unable to prove that G.M. either manufactured or sold the CR–2 rim which exploded and caused his injury. Having failed to show that G.M. placed the allegedly defective rim into the stream of commerce, the plaintiff cannot show that G.M. is responsible for his injuries and cannot establish causation in fact. W. Prosser, Handbook of the Law of Torts § 41 (1971).

Regardless of the theory which liability is predicated upon, whether negligence, breach of warranty, strict liability in tort, or other grounds, it is obvious that to hold a producer, manufacturer, or seller liable for injury caused by a particular product, there must first be proof that the defendant produced, manufactured, sold, or was in some way responsible for the product ....

Annot: 51 A.L.R.3d 1344, 1349 (1973) (cited with approval in *Ryan v. Eli Lilly & Co., supra* ).

Where, as here, the defendant manufacturer did not incorporate the defective component part into its finished product, the rationale for imposing liability is no longer present. The manufacturer has not had an opportunity to test, evaluate and inspect the component, it has derived no benefit from its sale, and it has in no way represented to the public that the component part is its own. Although the court can locate no South Carolina authority directly addressing the liability of a manufacturer

for a component part supplied by a third party, there is a substantial body of law from other jurisdictions which would indicate that summary judgment is appropriate in this case.

In *Cousineau v. Ford Motor Co.*, 140 Mich.App. 19, 363 N.W.2d 721 (1985), the plaintiff's decedent was killed while he was repairing a truck tire. Since plaintiff could not identify the rim which fatally injured her decedent, she sued six wheel manufacturers and two truck manufacturers, alleging alternative liability and concert of action products liability theories. Most of the defendants moved for summary judgment on the ground that plaintiff could neither identify the manufacturer nor seller of the explosive rim. The court granted summary judgment, and the Michigan Court of Appeals affirmed. In discussing the alleged liability of the defendant truck manufacturers, the court held:

> As to the vehicle manufacturers, plaintiff's claim of alternative liability is insufficient as well. Trucks are not generic products posing identification difficulties. Plaintiff admits she cannot identify the particular vehicle which was equipped with the subject wheel assembly. In addition, she cannot prove that the wheel was used as original equipment on any of the trucks at decedent's work place. The defendant vehicle manufacturers are not in the business of making three-piece rims. Though a vehicle manufacturer may be held liable for damages caused by defective component parts supplied by another entity, *Comstock v. General Motors Corp.*, 358 Mich. 163, 99 N.W.2d 627 (1959), *this duty has not yet been extended to component parts added to a vehicle subsequent to distribution.* Assuming the existence of a defect, plaintiff must "trace that defect into the hands" of the defendant. *Caldwell v. Fox*, 394 Mich. 401, 410, 231 N.W.2d 46 (1975). "[T]he threshold requirement of any products liability action is identification of the in-

jury-causing product and its manufacturer." *Abel* [*v. Eli Lilly and Company*], 418 Mich. [311] 324, 343 N.W.2d 164 [(1984)]. Failure of a component not supplied by the manufacturer does not give rise to liability on the manufacturer's part. *Antcliff v. State Employees Credit Union*, 95 Mich.App. 224, 231–233, 290 N.W.2d 420 (1980), *aff'd* 414 Mich. 624, 327 N.W.2d 814 (1982).

*Id.* at 30–31, 363 N.W.2d at 727–28 (emphasis added). Just as in *Cousineau*, the plaintiff herein cannot identify the accident rim as having been sold by G.M., and G.M. neither designed nor manufactured CR-type rims. Accordingly, plaintiff cannot trace the defect into the hands of G.M. and thus cannot prove liability on its part.

Another recent Michigan decision is factually similar to the present case. In *Spencer v. Ford Motor Co.*, 141 Mich.App. 356, 367 N.W.2d 393 (1985),[3] a multi-piece rim and tire assembly exploded in plaintiff's face as he attempted to repair it, causing personal injury. The plaintiff was unable to locate the exact rim which caused his injury, and admitted that the accident rim was not the original equipment supplied with the Ford truck. The plaintiff, however, contended that the truck itself was defective since the vehicle could accommodate a dangerous rim. The Michigan Court of Appeals affirmed the grant of summary judgment in favor of Ford. The court, quoting the aforementioned language of the *Cousineau* opinion, reaffirmed the principles underlying *Cousineau* and held that "plaintiff's contention that Ford should be liable for a wheel rim component added subsequent to distribution of the Ford vehicle has no support in our case law." 141 Mich.App. at 361, 367 N.W.2d 393. The court further rejected the plaintiff's contention that the truck was defective because the wheel housing could accept a defective rim.

> [F]inding a vehicle defective or a vehicle manufacturer liable simply because the vehicle could accommodate dangerous or

---

**3.** The *Spencer* case was not available to the parties at the time this case was argued. *Spenc-* er was decided on March 18, 1985, and this court heard arguments on March 5, 1985.

defective replacement components manufactured by another would have far-reaching undesirable results. For example, car manufacturers would be liable every time a defective tire blew up because a defective tire fit the vehicle. *Id.* Although the aforementioned decisions are not controlling precedent in this jurisdiction, the well-reasoned *Spencer* and *Cousineau* opinions are factually similar to the present case and the court finds the reasoning therein to be highly persuasive.

Courts in other jurisdictions have reached the same conclusion as the Michigan courts. The Supreme Court of Minnesota, in an early products liability case, *Hardware Mutual Casualty Co. v. Chrysler Corp.*, 274 Minn. 87, 142 N.W.2d 728 (1966), was confronted with the failure of a component part of an automobile's power steering assembly resulting in loss of steering control and a subsequent accident. Plaintiff's theory was that the collision was caused by Chrysler's negligence in equipping the Chrysler automobile with a defective power steering assembly, the failure of a component part of which caused the accident. The trial resulted in a verdict for the plaintiff, and Chrysler appealed on the ground that the "sector shaft", the allegedly defective part, did not appear to be a Chrysler component. After reviewing the record, the Minnesota Supreme Court found that the evidence did not support a finding that the sector shaft was part of the Chrysler vehicle at the time it left Chrysler's hands. As stated by the court:

> But if the housing which encased the sector shaft at the time of the accident was not in existence when the car left Chrysler's hands, can we say that the assembly was not altered in the interval? And if the alteration involved resulted in the replacement of the housing, what basis do we have, save conjecture, for deciding that the sector shaft was not also replaced? *And if replaced, how can we hold Chrysler liable when the source of replacement parts for the Gemmer-Manuafactured Steering Assembly might or might not have been Chrysler?* We have examined the record

and briefs with care and find no answers to these questions.

142 N.W.2d at 737 (emphasis added). As such, the court remanded the case for further factual findings on the issue of whether the sector shaft had been supplied by Chrysler. In the case at bar, unlike the *Chrysler* case, the plaintiff clearly cannot establish that the allegedly defective CR–2 rim assembly which caused his injury was ever sold by G.M., and it is clear that the allegedly defective rim was not the original equipment on the 1979 G.M.C. truck.

In *Riggins v. Ford Motor Co.*, 596 F.Supp. 1379 (E.D.La.1984), the plaintiff was injured when his hand became ensnared in the hydraulic presser of a garbage truck. Defendant Ford designed only the cab and chassis of the truck, and a subsequent manufacturer affixed the trash compactor to the chassis. The court held that Ford could not be held liable in a products liability action for plaintiff's injuries allegedly caused by the product of another manufacturer, which was placed on the cab and chassis by someone other than Ford. Similarly, in the present case, there is no evidence that G.M. sold the injury-causing component, the wheel assembly, and thus G.M. cannot be held responsible for a defect in the component.

Although plaintiff admittedly cannot identify the exploding wheel assembly as a G.M. product, he has attempted to assert that the overall design of the truck, which clearly was a G.M. product, was defectively designed because it was sold with CR–3 rims. Plaintiff asserts that the CR–3 rim assembly is defective in the same manner as the CR–2 rim assembly which caused his injury, and since G.M. designed the truck and sold it with a CR–3 rim, its defective design renders it liable. This argument must fail as a matter of law, since it does not address the fact that the real, efficient and legal cause of plaintiff's injury was the explosion of a CR–2 rim assembly. No matter how similar in design to the CR–2 type, a CR–3 rim simply did not explode and cause plaintiff's injury. Since this alleged design defect was not the cause in fact of plaintiff's injury, plaintiff's contention must fail.

In his brief and on oral argument, plaintiff contends that the G.M.C. truck is defective in that it can accept only rims of the dangerous multi-piece variety. Plaintiff asserts that since the truck's wheel housing will accept dangerous rims, the truck is defectively designed. As in *Spencer*, this assertion is not supported by the facts of this case. At the hearing on this motion, G.M. presented evidence that the wheel housing could accept single piece rims as well as multi-piece rim assemblies. It is abundantly clear that plaintiff's injury was caused by an exploding rim, not by the housing assembly on the truck. Since plaintiff cannot establish that the injury-causing rim was supplied by G.M., he cannot recover in this action.

■ Plaintiff finally argues that the G.M.C. truck was defective because G.M. failed to adequately warn of the dangers associated with multi-piece rims. Since the exploding accident rim was a replacement component part and not original equipment, plaintiff implicitly argues that a manufacturer of a vehicle has a duty to test all possible replacement parts made by any manufacturer to determine their safety, and it must warn against use of certain replacement parts. Just as in *Spencer, supra*, this court is of the opinion that the common law duty to warn does not extend to component parts not incorporated by the vehicle manufacturer.

Academically, it may be argued that all products are defective because they can be made more safe. However, it does not automatically follow that the products are deemed "unreasonably dangerous." In the final analysis, we have another of the law's balancing acts and numerous factors must be considered, including the usefulness and desirability of the product, the cost involved for added safety, the likelihood and potential seriousness of the injury, and the obviousness of the danger.

*Claytor v. General Motors Corp.*, 277 S.C. 259, 265, 286 S.E.2d 129, 132 (1982). If the law were to impose such a duty, the burden upon a manufacturer would be excessive. While a manufacturer can fairly be charged with testing and warning of dangers it decides to incorporate into its product, it cannot be charged with testing and warning against any of a myriad of replacement parts supplied by any of numerous manufacturers; this duty to warn must properly fall upon the manufacturer of the replacement component part. Since G.M. could not properly be charged under the law with the duty to warn against replacement component parts, plaintiff's failure to warn theory of liability cannot prevail.

■ Even were this court to find that G.M. had a duty to warn, it cannot be said that the failure to do so proximately caused plaintiff's injury. Plaintiff herein was a knowledgeable user of multi-piece rim assemblies, being an experienced tire repairman. Plaintiff stated at his deposition that he had seen and read literature describing safety procedures for mounting various types of multi-piece rim assemblies and had been engaged in the business as a tire mechanic for over two and one-half years. Indeed, when inflating the accident wheel assembly, plaintiff kept the assembly in an inflation cage to prevent injuries from an explosion during inflation. (Plaintiff's deposition at 43). Since plaintiff knew of the explosive danger associated with multi-piece rims, the failure to warn him of their propensity to separate was not the proximate cause of his accident, as a warning would not have altered plaintiff's conduct. "Implicit, therefore, in the duty to warn is the requirement that the user be ignorant of the dangers warned against. [citations omitted.] Thus, it is generally held that there is no duty to warn when the danger or potential danger ... is actually known to the injured person." *Hagans v. Oliver Machinery Co.*, 576 F.2d 97, 102 (5th Cir. 1978). *See also, Hagan v. EZ Manufacturing Co.*, 674 F.2d 1047 (5th Cir.1982); *Sowles v. Urschel Laboratories, Inc.*, 595 F.2d 1361 (8th Cir.1979); 63 Am.Jur.2d *Products Liability* § 545 (1984). Since plaintiff was aware of the explosive nature of multi-piece rims, the failure of G.M. to warn of their explosive propensity was not the proximate cause of plaintiff's injuries.

Plaintiff contends that, while he was aware that multi-piece rim assemblies could

explode in an inflation cage during inflation, he was not aware that wheel assemblies could explode once the tire was inflated. Plaintiff's deposition, however, clearly indicates otherwise. Plaintiff knew that a multi-piece rim could separate at some time other than in the inflation process (Plaintiff's deposition at 31). Prior to the accident, plaintiff had seen a television documentary explaining that the rims could separate. Plaintiff stated, "Oh, I've seen it before I, you know, this here happened. I thought about it a lot of times when I changed tires, you know, but its one of them things where, you know, it ain't going to happen to me. That's what I figured." (Plaintiff's deposition at 103). Since plaintiff was aware of the danger, the defendant's failure to warn could not be the proximate cause of plaintiff's accident. *Shanklin v. Allis-Chalmers Manufacturing Co.*, 383 F.2d 819 (4th Cir.1967).

■ Although products liability actions are ordinarily not susceptible of summary adjudication, this court may properly grant summary judgment where the material facts are not in dispute and a party is entitled to judgment as a matter of law. Because plaintiff cannot show that the defendant exercised dominion over the allegedly defective rim, defendant may not be held liable under any tort theory. If the defect is not present at the time a product leaves the control of the manufacturer, but is later introduced into the product by another, the manufacturer may not be held liable under the theory of strict products liability. *Grover Hill Grain Co. v. Baughman-Oster, Inc.*, 728 F.2d 784 (6th Cir. 1984); *Keet v. Service Machine Co.*, 472 F.2d 138 (6th Cir.1972); *Kellar v. Inductotherm Corp.*, 498 F.Supp. 172 (E.D.Tenn. 1978).

While [strict liability in tort] is meant to require manufacturers and sellers to bear much of the responsibility and cost of injuries to consumers resulting from their defective products, it is not meant to impose upon each manufacturer and seller an absolute liability as insurer for all injuries to consumers, regardless of the relation of plaintiff's injuries to the particular defendant's product.

*Southwire Co. v. Beloit Eastern Corp.*, 370 F.Supp. 842, 848 (E.D.Pa.1974). Since plaintiff cannot show that G.M. placed any product into the stream of commerce which caused him injury, he cannot recover in strict tort. Furthermore, it is well established in South Carolina that the failure to make out a *prima facie* case in strict tort liability likewise constitutes a failure to make out a case under the same facts arising in negligence or warranty. *Claytor v. General Motors Corp.*, 277 S.C. 259, 286 S.E.2d 129 (1982). For the foregoing reasons and based upon the cited authorities,

IT IS ORDERED that the defendant's motion for summary judgment be, and the same hereby is, granted. Rule 56, Federal Rules of Civil Procedure.