**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1784

ERNEST CHAPPELL, Individually, and as the Personal Representative of the Estate of Christopher Lee Chappell,

Plaintiff - Appellant,

v.

TRUCKPRO, LLC,

Defendant - Appellee.

Appeal from the United States District Court for the District of South Carolina, at Florence. Joseph Dawson, III, District Judge. (4:21-cv-02371-JD)

Argued: May 9, 2025                                    Decided: June 25, 2025

Before NIEMEYER, AGEE and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Jordan Christopher Calloway, MCGOWAN, HOOD & FELDER, LLC, Rock Hill, South Carolina, for Appellant. Kenyatta Laffette Gardner, Bradish Johnson Waring, BUTLER SNOW LLP, Charleston, South Carolina, for Appellee. **ON BRIEF:** Robert V. Phillips, MCGOWAN, HOOD, FELDER & PHILLIPS, LLC, Rock Hill, South Carolina, for Appellant. Stephen P. Groves, BUTLER SNOW LLP, Charleston, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This appeal involves a South Carolina products liability dispute stemming from a fatal car accident. Christopher Lee Chappell ("Decedent") was killed while hauling a load of logs on a flatbed trailer. A protective device known as a cab guard (the "Subject Cab Guard") was attached to Decedent's truck, but it allegedly malfunctioned during the accident. Decedent's brother, Ernest Chappell, individually and as personal representative of Decedent's estate ("Appellant"), commenced this action seeking relief against TruckPro LLC ("TruckPro"). The district court granted summary judgment in favor of TruckPro, concluding that Appellant had not sufficiently demonstrated that TruckPro placed the Subject Cab Guard into the stream of commerce.

We agree and affirm the district court's grant of summary judgment.

I.

On August 13, 2019, Decedent was driving a 2005 freightliner while transporting logs through South Carolina. After being cut off by another vehicle, Decedent attempted to brake and lurched into a ditch. Upon impact, the load of logs he was transporting shifted forward, crushing the passenger cab and killing Decedent. In order to prevent this exact type of accident, tractor trailers are to be fitted with a "cab guard." A cab guard "is a metal device that is bolted to a tractor cab frame and stands upright between the trailer and the rear of the truck's cab." J.A. 50.[1] The truck Decedent was driving was fitted with the Subject Cab Guard, but it failed to protect him.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

2

At the time of the accident, Decedent was employed by Turner Trucking, which was owned by James Turner ("Turner"). Both the truck Decedent was driving and the Subject Cab Guard were the property of Turner Trucking. And it is undisputed that Road Gear Truck Equipment, LLC ("Road Gear") manufactured the Subject Cab Guard. Road Gear, a now defunct business, manufactured heavy duty truck parts and sold them to distributors, including TruckPro.

## A.

On June 30, 2021, Appellant filed a complaint against TruckPro in the South Carolina State Court of Common Pleas. Appellant asserted that "TruckPro, based out of Tennessee, purchased a number of . . . [cab guards] from Road Gear and contracted to have a number of them delivered to TruckPro's distribution center in/near Memphis, [Tennessee]." J.A. 14 ¶ 13. Appellant claimed that TruckPro purchased the Subject Cab Guard from Road Gear and "shortly thereafter sold the [Subject Cab Guard] to a "truck center" located in or near Florence, South Carolina." *Id.* at ¶ 15. Appellant claimed that "this 'truck center' sold the [Subject Cab Guard] to the owner of the [truck] involved in the death of Decedent." *Id.* at ¶ 17.

Appellant also asserted that "these [cab guard] type devices provided virtually no protection from large or heavy objects on a flatbed trailer in the event of a crash or sudden stop." *Id.* at ¶ 18. Appellant then alleged "that the [cab guard] was sold in an unreasonably dangerous condition and contained no warning and was therefore unreasonably dangerous and defective in various ways." *Id.* at 17 ¶ 32. Appellant alleged seven causes of action: (1) Negligence, Gross Negligence, and Recklessness, (2) Strict Liability; (3) Breach of

Implied Warranty; (4) Fraud and/or Intentional or Reckless Misrepresentation; (5) violation of the South Carolina Unfair Trade Practices Act; (6) Wrongful Death, and (7) Survivorship.

On July 30, 2021, TruckPro filed a notice of removal in the United States District Court for the District of South Carolina based on diversity of citizenship pursuant to 28 U.S.C. § 1332.  The parties then engaged in discovery on Appellant's claims.

B.

The Subject Cab Guard had two distinctive markings.  First, three digits -- 448 -- were etched onto the Subject Cab Guard.  Second, the Subject Cab Guard had a Road Gear manufacturing tag.  During his deposition, Jason Gist, a company representative of Road Gear, testified that the 448 etching on the Subject Cab Guard referred to the manufacture date, meaning any cab guard with a 448 etching was manufactured on April 4, 2008.  Gist further testified that Road Gear manufactured at least twelve cab guards that were each stamped with the 448 etching.

Road Gear's shipping records indicate that Road Gear shipped two cab guards to Trailmobile Distribution ("Trailmobile") on April 7, 2008.  But Road Gear's shipping records do not identify whether those cab guards had the distinctive 448 etching.  Instead, the shipping records only identify the cab guards by a part number: 68200008 (the "Part Number").  Nevertheless, Gist testified it was his understanding that the two cab guards Road Gear shipped to Trailmobile on April 7, 2008, were 448 cab guards.  *See* J.A. 170 ("Q: And is it your understanding that these two part numbers, 68200008, were part of that manufacturing run that was done on April 4, 2008 that we just talked about?  Gist: Yes.").

4

In addition, Gist testified to his belief that Road Gear shipped ten 448 cab guards to TruckPro on April 9, 2008.  Like the Trailmobile shipping records, however, the records notating the sale of the ten cab guards to TruckPro do not contain any reference to the 448 etching.  Instead, the cab guards are again listed only by the Part Number.  Nonetheless, Gist explained that Road Gear "believed" that these ten cab guards were also part of the manufacturing run performed on April 4, 2008.  *Id.* at 171.  Gist based this belief on the typical business practice of Road Gear and explained, "we don't build a lot of inventory, so it's usually we build to ship."[2]  *Id.* at 176.

Notably, Gist was unclear as to the total number of cab guards Road Gear manufactured on April 4, 2008.  Gist testified that he was "not aware" of any other cab guards manufactured that day and that it was unlikely that more than twelve cab guards were produced.  *See* J.A. at 172 ("I'm not aware of any more.  I do not know how many [were] actually built that day, but don't know.").  But, Gist conceded that "it is possible" that more than twelve cab guards were manufactured on that day and stamped with the 448 etching.  *Id.*

Based upon Gist's testimony, Appellant believes that the Subject Cab Guard was one of the twelve potentially 448 cab guards Road Gear shipped to Trailmobile and TruckPro.

---

[2] A "build to ship" practice involves not maintaining a high stock of inventory and instead building products close in time to the order date.

5

C.

Appellant also believes that after TruckPro acquired the cab guards from Road Gear, it placed them into the stream of commerce such that one ultimately ended up on the truck Decedent was driving.

TruckPro's shipping records illustrate that from January to July 2008, it sold eight cab guards with the Part Number to various businesses throughout South Carolina. But, like Road Gear's shipping records, TruckPro's records also do not include any reference to a date of manufacture or the 448 etching. Instead, the cab guards are again identified by reference to the Part Number. However, as Gist explained, the Part Number was not unique to 448 cab guards. Instead, the Part Number was used by Road Gear for every cab guard it manufactured.

For his part, Turner could not identify how or when he came to own the Subject Cab Guard. Turner testified that at some point between 2012 and 2014, he purchased a cab guard from either "Stone Group" or "Stone Trucking," but he could not be sure whether it was the Subject Cab Guard. J.A. 84; *see also id.* ("Q: Stone Group or Stone Trucking here in Florence around this area? A: I had bought one one time before, but I'm not sure if that's one that's on the truck from him."). In any event, Turner testified that he believed the Subject Cab Guard had been purchased used and then initially placed on a "98 International" truck. J.A. 83. Turner explained that he "couldn't say for sure" when he bought that cab guard or from where it was purchased. *Id.* at 85. But at an unknown later date, Turner removed the cab guard from the '98 International and installed it on the cab of Decedent's 2005 freightliner. *See id.* at 85–86 ("Q: Okay. That cab guard that was on

6

the back of [Decedent's] truck, you had taken the cab guard off of a '98 International truck; is that correct?  A: I'm pretty sure.  I'm not a hundred percent sure, but I know that the -- I had the cab guard that was put on his truck.").

                                                    D.

On October 21, 2022, TruckPro moved for summary judgment, arguing that Appellant failed to present any evidence demonstrating that TruckPro ever possessed or sold the Subject Cab Guard.  On July 26, 2023, the district court granted TruckPro's motion for summary judgment on all counts, holding that Appellant failed to produce sufficient evidence establishing that TruckPro distributed the Subject Cab Guard.

Appellant timely appealed.

                                                    II.

We review a district court's grant of summary judgment de novo.  *Owners Ins. Co. v. Walsh*, 134 F.4th 776, 778 (4th Cir. 2025).  We will uphold a grant of summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Once the moving party has met that burden, the non-moving party must come forward and demonstrate that such an issue does, in fact, exist.  *Id.*  Further, a party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleadings but must set

7

forth specific facts showing that there is a genuine issue for trial." *Id.* (internal citations omitted).

III.

A.

In South Carolina, a products liability case may be brought under several theories, including strict liability, warranty, and negligence. *See Small v. Pioneer Mach., Inc.*, 494 S.E.2d 835, 842 (S.C. Ct. App. 1997). In this case, Appellant relies on a strict liability theory to argue that TruckPro, as a distributor, is liable for any alleged failure of the Subject Cab Guard. In any products liability action, a plaintiff must establish three elements:

> (1) he was injured by the product; (2) the injury occurred because the product was in a defective condition, unreasonably dangerous to the user; and (3) the product at the time of the accident was in essentially the same condition as when it left the hands of the defendant.

*Id.*

Relevant here, a South Carolina products liability plaintiff must ensure the proper defendant is alleged to be liable, which requires demonstrating that the defendant placed the defective product into the stream of commerce. *Baughman v. General Motors Corp.*, 627 F. Supp. 871, 874 (D.S.C. 1985). Further, "it is elementary that in any action claiming injury from a product, the plaintiff must show causal connection between the defendant . . . *and that product*." *Id.* (emphasis supplied) (internal citation omitted). This requires a "showing that the defendant either manufactured, sold[,] or exercised control over the defective product." *Id.* To succeed on a products liability claim, a plaintiff need not show a direct sale from a manufacturer or distributor to an end user. But crucially, a plaintiff

8

must demonstrate that the defendant exercised dominion over the allegedly defective product at some point before selling or distributing it. *Id.* ("Under the doctrine of strict liability in tort, the focus has been upon whether or not the assembler has sold the defective component part and thus placed it in the stream of commerce."). Therefore, in order to determine whether TruckPro may be held liable in this case, we must be able to follow the path of the Subject Cab Guard and discern whether TruckPro placed it into the stream of commerce.

Appellant argues that the district court erred in granting summary judgment because "[Appellant] had not shown TruckPro sold Turner the subject cab-guard." Appellant's Opening Br. at 15 (citing J.A. 215). The district court was of the view that "to survive summary judgment, [Appellant] must present evidence, even if disputed, that Turner in fact bought the cab guard from TruckPro to establish TruckPro's product caused Decedent's injuries." J.A. 213. And because there was no evidence of such a direct sale, the district court granted TruckPro's motion for summary judgment. But the District Court's formulation of the standard was a misstatement of South Carolina law.

As explained above, South Carolina does not require a plaintiff to establish that the defendant directly sold the offending product to the plaintiff. *See Henderson v. Gould, Inc.*, 341 S.E.2d 806, 810 (S.C. Ct. App. 1986) ("[T]he doctrine of strict liability may be applied if the requirements for its application are otherwise met, even though no sale has occurred in the literal sense."). Therefore, Appellant could prevail on his strict liability claim without demonstrating that TruckPro directly sold the Subject Cab Guard to Turner Trucking. *See also id.* ("The word 'sells' as contained in the [products liability statute] is

9

merely descriptive, and the product need not actually be sold if it has been injected into the stream of commerce by other means.") (internal citation omitted).  Thus, the district court's evaluation of Appellant's claim was incorrect.  However, we may affirm on any ground present in the record.  *See Attkisson v. Holder*, 925 F.3d 606, 622–23 n.7 (4th Cir. 2019).  And here, the record indisputably demonstrates that Appellant failed to sufficiently connect TruckPro to the Subject Cab Guard.

B.

While a strict products liability claim does not require a direct sale in order to hold a distributor liable, a plaintiff still must establish that the distributor exercised dominion over the offending product at some point in the distribution chain.  *Baughman*, 627 F. Supp. at 874 ("Any theory of [products] liability, however, requires that the [defendant] actually sell *or otherwise place the defective product on the market*.") (emphasis supplied).

The parties dispute the standard of proof required to sufficiently connect a defective product to a defendant.  Appellant argues that the district court erred by requiring *certainty* that the offending product was put into the stream of commerce by TruckPro, as opposed to requiring only that the link between the Subject Cab Guard and TruckPro be established by a preponderance of the evidence.

South Carolina has not yet articulated the precise level of proof required to identify the distributor of an allegedly defective product.  However, federal district courts applying South Carolina state law have considered cases in which the manufacturer of an allegedly defective product was unknown.

10

In *Ryan v. Eli Lilly & Co.*, 514 F. Supp. 1004, (D.S.C. 1981), the plaintiff brought suit alleging that she developed a pre-cancerous condition as a result of her prenatal exposure to diethylstilbestrol ("DES").[3] The plaintiff alleged that the DES ingested by her mother was manufactured by either Eli Lilly *or* E.R. Squibb and Sons. Both Eli Lilly and E.R. Squibb and Sons moved for summary judgment asserting that, because the plaintiff could not identify the manufacturer of the specific DES tablets at issue, neither one could be held liable. The district court agreed. Upon review of the South Carolina products liability statute, the court determined, "[t]he defendant manufacturer must be identified with the specific instrumentality that allegedly caused the injury," and "[p]roof connecting the defendant with the instrumentality of the alleged defect is necessary regardless of the theory upon which plaintiff relies." *Id.* at 1006–07. The court concluded, "[t]he unequivocal law of South Carolina is the plaintiff in a negligence action has not only the burden of proving negligence but also the burden of proving that the injury or damage was caused by the actionable conduct of the particular defendant." *Id.* at 1018. Thus, because both defendants were equally likely to have manufactured the drug that allegedly caused the injuries at issue, the court granted summary judgment in favor of all defendants.

In *Baughman v. General Motors Corp.*, the district court considered a similar question. 627 F. Supp. 871 (D.S.C. 1985). In that case, the plaintiff was changing a truck tire when a rim assembly of the truck separated and exploded. The plaintiff sued General

---

[3] DES is a synthetic estrogen "promoted in the late 1940's and early 1950's for use by pregnant women to prevent loss of the fetus by spontaneous abortion." *Ryan*, 514 F. Supp. at 1006.

Motors, the manufacturer of the truck, alleging that the rim assembly was defective. But, because the assembly was not original to the truck, and the plaintiff could not locate the specific assembly that injured him, the district court held the plaintiff could not establish that General Motors placed the rim assembly into the stream of commerce.

The *Baughman* court noted, "[i]t is a fundamental principle of the [South Carolina] law of products liability that a product manufacturer is not an insurer of its product, and a plaintiff may recover against a manufacturer only upon a showing that the product was in a defective condition unreasonably dangerous at the time it left the manufacturer's control." *Id.* at 874. The court further explained, "[a]s a necessary corollary, the plaintiff must be capable of showing that the defendant either manufactured, sold or exercised control over the defective product." *Id.* Because the plaintiff could not demonstrate that the rim was original to the General Motors truck or that General Motors placed the allegedly defective rim on the truck, he could not prove that General Motors had previously exercised the required dominion over the allegedly defective product. Therefore, the court held, "defendant may not be held liable under any tort theory." *Id.* at 878.

Based on these cases, it is clear that in order to prevail on a products liability claim in South Carolina, a plaintiff must link the specific, allegedly defective product to the defendant he seeks to hold liable. We think it reasonable to assume that this link must be proven by *at least* a preponderance of the evidence. Therefore, mere speculation or conjectural evidence is insufficient to survive summary judgment as to product/defendant identification. This assumption accords with those of other jurisdictions. *See McMahon v. Eli Lilly and Co.*, 774 F.2d 830, 834 (7th Cir 1985) ("As with other elements of proof in

12

a civil action, product identification need only be established by a preponderance of the evidence."); *see also Kramer v. Weedhopper of Utah, Inc.*, 490 N.E. 2d 104, 107–08 (Ill. App. Ct. 1986) (holding that "a preponderance of the evidence will suffice" to prove "the supplier's link to the product in question"); *Gassman v. Eli Lilly and Co.*, 407 F. Supp. 2d 203, 213 (D.D.C. 2005) (denying defendant's motion for summary judgment because the court was "satisfied that a jury question exists as to whether [the plaintiff's] injuries were caused by [defendant's] drugs"); *Healey v. Firestone Tire & Rubber Co.*, 663 N.E.2d 901, 901 (N.Y. 1996) ("the circumstantial evidence of the identity of the manufacturer of a defective product causing personal injury must establish that it is reasonably probable, not merely possible or evenly balanced, that the defendant was the source of the offending product.").

## C.

Appellant asserts that he has demonstrated by a preponderance of the evidence that TruckPro was the distributor of the Subject Cab Guard. In support of this conclusion, Appellant relies on the combination of four pieces of evidence:

- the 448 etching on the Subject Cab Guard;

- the Part Number, 68200008, printed on both Road Gear and TruckPro receipts;

- Road Gear's shipping records for the April 4, 2008 manufacturing run which demonstrate, when combined with Gist's testimony, that ten 448 cab guards were shipped to TruckPro and two were shipped to Trailmobile in April 2008; and,

- Road Gear's routine shipping and manufacturing processes, specifically Road Gear's build to ship model.

13

Appellant asks us to combine these pieces of circumstantial evidence with a series of assumptions in order to link the Subject Cab Guard to TruckPro.

First, according to Appellant, we must assume that because Gist testified that Road Gear did not typically maintain stock inventory, only twelve 448 cab guards were produced and ten of those were shipped to TruckPro. Appellant asks us to make this assumption despite Gist's testimony that the twelve cab guards for which Appellant produced shipping records were likely -- but not certainly -- the only 448 cab guards produced.

Next, Appellant asks us to rely on TruckPro's shipping records which demonstrate that TruckPro sold at least eight cab guards, notated only by the non-unique Part Number, throughout 2008. Appellant asks us to assume that these eight cab guards were 448 cab guards. But, again, this assumption rests on shaky ground because TruckPro's shipping records demonstrate that the first of the eight cab guards was sold in January of 2008 -- *before* the April 14, 2008, production of the 448 cab guards.

Despite this, Appellant asks us to conclude "there is a 10 out of 12 probability, and therefore an 83.3% likelihood, that the cab guard that failed in the collision that killed [Decedent] passed through TruckPro's distribution facility on its way to [Turner]." Appellant's Opening Br. at 17.

Appellant's conclusion is not supported by the record. First, the record contains only speculation that the cab guards Road Gear shipped to TruckPro were 448 cab guards. But even if we assume they were, there is no record evidence purporting to trace the 448 cab guards after they were shipped from Road Gear to TruckPro and Trailmobile in April 2008. Appellant attempts to fill this gap by relying on TruckPro's 2008 shipping records

14

which demonstrate that cab guards identified by the Part Number, were shipped from TruckPro to South Carolina. Critically, however, these shipping records contain no information that would allow us to identify the ten 448 cab guards TruckPro supposedly purchased from Road Gear. This is so because the Part Number is not unique to 448 cab guards. Indeed, the record demonstrates that TruckPro distributed one cab guard with the same Part Number in January 2008 -- before the 448 production date of April 4, 2008. On this record then, there is no evidence beyond pure speculation demonstrating that TruckPro put any of the 448 cab guards into the stream of commerce in South Carolina. In fact, the record could equally support a conclusion that all ten 448 cab guards remain in TruckPro's warehouse in Memphis, Tennessee.

Therefore, we have no trouble concluding that Appellant failed to demonstrate the requisite connection between the Subject Cab Guard and TruckPro by a preponderance of the evidence.

## IV.

For the foregoing reasons, the district court's grant of summary judgment is

*AFFIRMED*.

15